# 13-1237-cv(L),
# 13-1328-cv(XAP), 13-1461-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

———————

ASSOCIATES AGAINST OUTLIER FRAUD,

*Plaintiff-Appellant-Cross-Appellee*,

UNITED STATES OF AMERICA,

*Plaintiff-Counter-Claimant-Counter-Defendant*,

STATE OF NEW YORK, *ex rel.* ASSOCIATES AGAINST OUTLIER FRAUD,

*Plaintiff*,

*(For Continuation of Caption See Inside Cover)*
———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE-CROSS-APPELLANT EMPIRE HEALTHCHOICE ASSURANCE, INC. D/B/A EMPIRE MEDICARE SERVICES

MICHAEL J. TUTEUR
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2600
Boston, Massachusetts 02199
(617) 342-4000

MICHAEL D. LEFFEL
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, Wisconsin 53703
(608) 257-5035

*Attorneys for Defendant-Appellee-Cross-Appellant
Empire HealthChoice Assurance, Inc. d/b/a Empire Medicare Services*

– v. –

HURON CONSULTING GROUP, INC., HURON CONSULTING GROUP,
LLC., HURON CONSULTING SERVICES, LLC., EMPIRE HEALTHCHOICE
ASSURANCE, INC. d/b/a EMPIRE MEDICARE SERVICES,

*Defendants-Appellees-Cross-Appellants*,

SPELTZ AND WEIS, KMPG,
HEALTHCARE MANAGEMENT SOLUTIONS, LLC.,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

WellPoint, Inc. (NYSE: WLP) ("WellPoint") is the parent corporation of Empire HealthChoice Assurance, Inc. ("Empire"). No publicly traded company owns 10% or more of Empire's stock. Empire notes that effective January 1, 2007, the Medicare functions of Empire were novated to National Government Services, Inc. ("NGS"). WellPoint is also the parent corporation of NGS and no publicly traded company owns 10% or more of NGS's stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES.................................................. iv

TABLE OF RECORD ABBREVIATIONS AND GLOSSARY ............................ ix

COUNTER-JURISDICTIONAL STATEMENT ....................................... 1

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW.................. 2

COUNTER-STATEMENT OF THE CASE ........................................ 2

FACTUAL AND PROCEDURAL BACKGROUND ............................... 6

    A.    Medicare Payments To Providers....................................... 6

        1.    How a provider obtains outlier payments. ................................ 6

        2.    Calculating outlier payments and cost-to-charge ratios............ 10

    B.    Identifying Cost Reports For Outlier Reconciliation.......................... 11

    C.    Empire's Work With CMS Regarding St. Vincent's. ......................... 13

        1.    St. Vincent's bankruptcy. ........................................... 13

        2.    Updates to St. Vincent's cost-to-charge ratios. ......................... 14

        3.    St. Vincent's 2005 and 2006 outlier payments and outlier reconciliation............................................................. 15

    D.    Work Background Of Relator And Public Disclosure. ....................... 18

    E.    Procedural History.................................................. 19

SUMMARY OF ARGUMENT ................................................ 21

ARGUMENT ............................................................ 26

I.    STANDARD OF REVIEW ............................................ 26

i

II.  THE DISTRICT COURT CORRECTLY HELD THAT EMPIRE IS
     ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE
     RELATOR CANNOT PROVE ESSENTIAL ELEMENTS OF HIS FCA
     CLAIM.................................................................................................26

     A.   Empire Had No Obligation, Nor Authority, To Take Additional
          Actions To Recoup Or Halt Funds Paid To St. Vincent's Prior To
          CMS's Adoption and Implementation Of The Outlier Reconciliation
          Procedures In 2011. .............................................................28

          1.   Relator's theory is based on a misinterpretation of the term
               "overpayments."....................................................................30

          2.   Empire did not fail to identify aberrant outlier payments. .......31

          3.   Empire did not fail to take steps to recover outlier payments to
               St. Vincent's. ........................................................................34

     B.   Relator Cannot Prevail Based On His Assertion That Empire Failed To
          Make Earlier Adjustments To The Cost-To-Charge Ratio For St.
          Vincent's. ...............................................................................36

          1.   Relator's argument regarding the cost-to-charge adjustment was
               not developed below and was thus waived.............................37

          2.   Empire was not required to make additional adjustments to St.
               Vincent's CCR......................................................................39

          3.   Empire did not breach any duty to notify CMS of the need for
               an adjustment to St. Vincent's CCR........................................40

          4.   Empire did not fail to perform PS&R reviews and desk audits.
               ..............................................................................................42

     C.   Relator Cannot Prevail On His New Assertions That Empire
          Recklessly Failed To Perform Other Required Tasks Under Its
          Contract With CMS.................................................................47

     D.   Relator Did Not And Cannot Demonstrate The "Knowingly" Element
          Of A False Claim. ..................................................................47

III.    THE DISTRICT COURT ERRED IN CONCLUDING THAT IT HAD SUBJECT MATTER JURISDICTION UNDER THE FALSE CLAIMS ACTS. ................................................................................52

    A.    There Is No Jurisdiction Under the FCA If There Has Been A Public Disclosure And Relator Is Not An Original Source. ...........................53

    B.    Relator Bears The Burden Of Demonstrating That FCA Section 3730(e)'s Jurisdictional Limitation Is Satisfied. .................................54

    C.    The District Court Correctly Held That Relator's Allegations Against Empire Are Based On Publicly Available Information. ......................56

        1.    Relator's complaint is based on government reports obtained through FOIA requests, which are public disclosures. .............56

        2.    There were other public disclosures, in addition to the FOIA information. ................................................................................59

    D.    Relator Is Not An Original Source Of The Allegations In The Complaint As To Empire. ....................................................................62

        1.    Relator must have direct and independent knowledge of the information upon which the claim is based. ............................62

        2.    Relator lacks the required direct and independent knowledge as to Empire's conduct. .................................................................64

        3.    The District Court's ruling is inconsistent with the Supreme Court's ruling in *Rockwell*. .......................................................66

CONCLUSION ........................................................................................68

CERTIFICATE OF COMPLIANCE ....................................................70

iii

# TABLE OF AUTHORITIES

CASES                                                                 PAGE(S)

*Amnesty Am. v. Town of W. Hartford*,
   288 F.3d 467 (2d Cir. 2002) .............................................................30

*Cohen v. Empire Blue Cross & Blue Shield*,
   176 F.3d 35 (2d Cir. 1999) ...............................................................61

*Costello v. N.Y. State Nurses Ass'n*,
   783 F. Supp. 2d 656 (S.D.N.Y. 2011) ................................................7

*Dingle v. Bioport Corp.*,
   388 F.3d 209 (6th Cir. 2004) ............................................................57

*Gould v. Winstar Coom's, Inc.*,
   692 F.3d 148 (2d Cir. 2012) .............................................................26

*Graham Cnty. Soil & Water Conservation Dist. v.
United States ex rel. Wilson*, 559 U.S. 280 (2010)............................55

*Hagood v. Sonoma Cnty. Water Agency*,
   81 F.3d 1465 (9th Cir. 1996) ............................................................50

*Holtz v. Rockefeller & Col., Inc.*,
   258 F.3d 62 (2d Cir. 2001) .................................................................7

*In re Natural Gas Royalties Qui Tam Litig.*,
   562 F.3d 1032 (10th Cir. 2009) .................................................*passim*

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008) .............................................................38

*Lee v. Alfonso*,
   112 App'x 106 (2d Cir. 2004) ..........................................................39

*Malik v. Meissner*,
   82 F.3d 560 (2d Cir. 1996) ...............................................................56

*Norton v. Sam's Club*,
   145 F.3d 114 (2d Cir. 1998) .............................................................39

*In re Pharm. Indus. Average Wholesale Pricing Litig.*,
    538 F. Supp. 2d 367 (D. Mass. 2008)..........................................................57, 64

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007)....................................................................................*passim*

*Safeco Ins. Co. of Am. v. Burr*,
    127 S. Ct. 2201 (2009)..........................................................................................49

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    131 S. Ct. 1885 (2011)........................................................................5, 25, 60, 69

*Sioson v. Knights of Columbus*,
    303 F.3d 458 (2d Cir. 2002) ...............................................................................30

*United States v. Catholic Healthcare W.*,
    445 F.3d 1147 (9th Cir. 2006) ............................................................................56

*United States v. N.Y. Med. Coll.*,
    252 F.3d 118 (2d Cir. 2001) .........................................................................64, 65

*United States v. Raymond & Whitcomb Co.*,
    53 F. Supp. 2d 436 (S.D.N.Y. 1999) .................................................................49

*United States ex rel. Conner v. Salina Reg'l Health Ctr.*,
    543 F.3d 1211 (10th Cir. 2008) ..........................................................................53

*United States ex rel. Cosens v. Yale-New Haven Hosp.*,
    233 F. Supp. 2d 319 (D. Conn. 2002)................................................................62

*United States ex rel. Dick v. Long Island Lighting*,
    912 F.2d 13 (2d Cir. 1990) .................................................................................65

*United States ex rel. Doe v. John Doe Corp.*,
    960 F.2d 318 (2d Cir. 1992) .........................................................................56, 57

*United States ex rel. Durcholz v. FKW, Inc.*,
    189 F.3d 542 (7th Cir. 1999) .........................................................................49, 50

*United States ex rel. Farmer v. City of Houston*,
    523 F.3d 333 (5th Cir. 2008) ..............................................................................50

*United States ex rel. Findley v. FPC-Boron Employees' Club*,
    105 F.3d 675 (D.C. Cir. 1997)................................................................63

*United States ex rel. Fine v. Sandia Corp.*,
    70 F.3d 568 (10th Cir. 1995) ...............................................................63

*United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*,
    436 F.3d 726 (7th Cir. 2006) ...............................................................63

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
    530 F.3d 980 (D.C. Cir. 2008)........................................................50, 51

*United States ex rel. King v. Hillcrest Health Ctr., Inc.*,
    264 F.3d 1271 (10th Cir. 2001) ...........................................................56

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
    601 F.3d 94 (2d Cir. 2010) ...................................................................26

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
    985 F.2d 1148 (2d Cir. 1993) .............................................51-52, 57, 63

*United States ex rel. Lam v. Tenet Heathcare Corp.*,
    481 F. Supp. 2d 673 (W.D. Tex. 2006) ...............................................62

*United States ex rel. Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001) .....................................................27, 28, 49

*United States ex rel. Olenick v. Presbyterian Intercommunity Hosp.*,
    No. CV06-4668-ABC, 2008 U.S. Dist. LEXIS 109635
    (C.D. Cal. June 16, 2008) ....................................................................61

*United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*,
    152 F. Supp. 2d 443 (S.D.N.Y. 2001) .................................................56

*United States ex rel. Poteet v. Lenke*,
    604 F. Supp. 2d 313 (D. Mass. 2009)..................................................56

*United States ex re. Precision Co. v. Koch Indus., Inc.*
    971 F.2d 548 (10th Cir. 1992) .............................................................56

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare*
    *Sys.*, 384 F.3d 168 (5th Cir. 2004).................................................56, 62

*United States ex rel. Rost v. Pfizer, Inc.*,
  507 F.3d 720 (1st Cir. 2007) ................................................................55

*United States ex rel. Williams v. Renal Care Grp., Inc.*,
  696 F.3d 518 (6th Cir. 2012) ...............................................................50

*United States v. Bank of Farmington*,
  166 F.3d 853, 861 (7th Cir. 1999)), *rev'd on other grounds*,
  *United States v. Baylor Univ. Med. Ctr.*,
  469 F.3d 263 (2d Cir. 2006) .................................................................60

*Visiting Nurse Ass'n of Brooklyn v. Thompson*,
  378 F. Supp. 2d 75 (E.D.N.Y. 2004) ....................................................50

**FEDERAL STATUTES**

28 U.S.C.
  § 1291 .....................................................................................................1

31 U.S.C.
  §§ 3729-3733 .............................................................. 1-2, 20, 22
  § 3729(a)(1)(A) .....................................................................................27
  § 3730(e) ..............................................................................................64
  § 3730(e)(4) ...................................................................................*passim*
  § 3730(e)(4)(A) (1986) ...................................................................54, 62
  § 3730 (e)(4)(A)(i) (2010) .....................................................................55
  § 3730(e)(4)(B) ...............................................................................55, 64

42 U.S.C.
  § 1395ww(d)(5)(A)(ii) ............................................................................8

Freedom of Information Act .........................................................*passim*

Patient Protection and Affordable Care Act of 2010,
  Pub. L. No. 111-148
  § 10104, 124 Stat. 119, 901 (2010) ...............................................54, 55

**STATE STATUTES**

N.Y. Stat. Fin. § 187 ...............................................................................20

## OTHER AUTHORITIES

42 C.F.R. § 412.84(i)(1)..................................................................38, 40

42 C.F.R § 412.84(i)(2)..................................................................10, 40

42 C.F.R. § 412.84(i)(4).................................................................*passim*

42 C.F.R. § 412.84(g) .........................................................................8

42 C.F.R. § 412.84(h) .........................................................................8

42 C.F.R. § 413.64(i) ......................................................................30, 31

68 Fed. Reg. 10420 (Mar. 5, 2003)............................................ 11-12, 31

68 Fed. Reg. 34,495 (June 9, 2003) ...................................................9

CMS Pub. 15-1, § 1408.2..................................................................40

CMS Pub. 100-04, Change Request 5286 (Oct. 6, 2006)....................8, 37

CMS Pub. 100-04, Change Request 7192 (Dec. 3, 2010) .................17, 34

CMS Pub. 100-06, Change Request 2350 (Oct. 18, 2002)........... 14, 32-33

CMS Pub. 100-06, Ch. 8, § 90 ..........................................................40

CMS Program Memorandum, A-02-122,
    Change Request 2500 (Dec. 3, 2002) ...........................................12

CMS Program Memoranum, A-03-058,
    Change Request 2785 (July 3, 2003).................................10, 12, 40

Medicare Fin. Mgmt. Manual, Ch. 3 § 140.42 ...............................31, 42

Fed. R. Civ. P. 56 ............................................................................39

Fed. R. Civ. P. 56(e).......................................................................7, 30

S.D.N.Y. Local Rule 56.1 ................................................................7, 30

## TABLE OF RECORD ABBREVIATIONS AND GLOSSARY

**Deposition Transcripts**

| Abbreviation | Document | Pages |
|---|---|---|
| Chamberlain Dep. | Excerpts from Deposition Transcript of Christine Chamberlain, dated May 8, 2012 | JA1712-38 |
| Hartmann Dep. | Excerpts from Deposition Transcript of Steven Hartmann, dated May 18, 2012 | JA1780-1816 |
| Landgraber Dep. | Excerpts from Deposition Transcript of Steven Landgraber, dated March 31, 2011 | JA195-208, JA448-73, JA562-613, JA1194-98 |
| Norwalk Dep. | Excerpts of Deposition Transcript of Leslie V. Norwalk, dated May 21, 2012 | JA1023-27, JA1223-28, JA1834-35 |
| Reisman Dep. | Excerpts of Deposition Transcript of Peter Reisman, dated June 14, 2012 | JA1146-48, JA1229-66, JA1846-1942 |
| Zingaro Dep. | Excerpts from Deposition Transcript of Michael Zingaro, dated May 8, 2012 | JA1765-79 |
| Yorke Dep. | Excerpts of Deposition Transcript of Dolly Ann Yorke, dated May 14, 2012 | JA2094-2107 |
| Yospe Dep. | Excerpts from Deposition Transcript of Eric Yospe, dated May 21, 2012 | JA1199-1222, JA2088-93 |

**Declarations**

| Abbreviation | Document | Pages |
|---|---|---|
| Chamberlain Decl. | Declaration of Christine Chamberlain in Support of Defendant Empire Medicare Services' Motion for Summary Judgment, dated June 18, 2012 | JA1314-41 |
| Chamberlain Supp. Decl. | Supplemental Declaration of Christine Chamberlain in Support of Defendant Empire Medicare Services' Motion for Summary Judgment, dated July 10, 2012 | JA2108-2301 |
| Glorioso Decl. | Declaration of Kevin Glorioso in Support of Defendant Empire Medicare Services' Motion for Summary Judgment, dated June 18, 2012 | JA1374-76 |
| Korpela Decl. | Declaration of Mark Korpela, dated May 23, 2012 | JA1149-58 |
| Landgraber Decl. | Declaration of Relator Plaintiff/Relator in Support of Relator's Opposition to the Motion to Dismiss, dated July 11, 2011, with Steven J. Landgraber's Resume | JA516-56 |
| Reisman Decl. | Declaration of Peter Reisman | JA1348-59<br><br>(*See also* Dkt. 130) |
| Zingaro Decl. | Declaration of Michael Zingaro in Support of Defendant Empire Medicare Services' Motion for Summary Judgment, dated June 18, 2012 | JA1360-73 |

**Other Documents**

| Abbreviation | Document | Pages |
|---|---|---|
| Fact Statement | Empire's Rule 56.1 Statement of Undisputed Facts | JA1377-1402 |
| Norwalk Rep. | Expert Disclosure of Leslie V. Norwalk, dated May 18, 2012 | JA1159-79 |
| TAC | Third Amended Complaint | JA92-124, JA2339-75 |

## GLOSSARY

| | |
|---|---|
| **CCR** | Cost-to-Charge Ratio |
| **CMS** | Centers for Medicare & Medicaid Services |
| **DRG** | Diagnosis-Related-Group |
| **Empire** | Empire HealthChoice Assurance, Inc. d/b/a/ Empire Medicare Services |
| **FCA** | False Claims Act |
| **FI** | Fiscal Intermediary |
| **FOIA** | Freedom of Information Act |
| **HHS** | Department of Health & Human Services |
| **Huron** | Huron Consulting Group, Inc., Huron Consulting Group, LLC, and Huron Consulting Services, LLC |
| **PS&R** | Provider Statistical and Reimbursement |

xi

| | |
|---|---|
| **PPS** | Prospective Payment System |
| **Relator** | Associates Against Outlier Fraud or Steven Landgraber |
| **St. Vincent's** | The three St. Vincent's Medical Center facilities at issue in this case: St. Vincent's Catholic Medical Center (provider number 330290), Catholic Medical Center (provider number 330357), and Sisters of Charity (provider number 330028) |
| **SVCMC** | St. Vincent's Catholic Medical Center |
| **TAC** | Third Amended Complaint |

## COUNTER-JURISDICTIONAL STATEMENT

For the reasons stated in the cross-appeal portion, Part III of the Argument Section of this brief, Defendant Empire HealthChoice Assurance, Inc., d/b/a Empire Medicare Services ("Empire")[1] disputes that jurisdiction exists based on the False Claims Act ("FCA"), 31 U.S.C. § 3729-33, because Relator's claims against Empire are based on publicly disclosed information and Relator is not an "original source" as to the claims against Empire. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 (2007); *see also* 31 U.S.C. § 3730(e)(4). The judgment was entered on March 8, 2013, SPA1. Relator filed a notice of appeal on April 2, 2013. SPA44. This Court has jurisdiction over the cross-appeal, timely filed on April 16, 2013, based on 28 U.S.C. § 1291. SPA46. Should this Court affirm the District Court's jurisdictional ruling, then Relator's jurisdictional statement is otherwise correct.

---

[1] Effective January 1, 2007, the Medicare functions of Empire were novated to National Government Services, Inc. ("NGS"). When "Empire" is referred to throughout this brief, it also includes a reference to "NGS" for conduct on or after January 1, 2007, with respect to the conduct in question.

1

**COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.   Whether the District Court correctly granted summary judgment to Empire when Relator was unable to point to any false certification by Empire or any applicable statute or regulation with which Empire "recklessly" failed to comply, and which was a condition of payment under Empire's contract with the Government.

2.   Whether the District Court erred in ruling that jurisdiction existed under the False Claims Act given that the District Court concluded that Relator's claims against Empire (a fiscal intermediary for the Government) were based on publicly available information, and Relator conceded that he did not know what Empire did to process the underlying hospital claims at issue other than that he knew payments were made with an older cost-to-charge ratio.

**COUNTER-STATEMENT OF THE CASE**

This case centers around the processing and payment of hospital claims under Medicare.  Relator[2] seeks to overturn the District Court's summary judgment ruling in favor of Empire, which rejected Relator's claim under the False Claims

_____

[2] As Mr. Steven Landgraber is the sole member of the entity "Associates Against Outlier Fraud," and because much of the discussion below is based on his testimony, Relator is typically desiganted herein by a personal pronoun such as "he" rather than an inanimate "it."

2

Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The District Court correctly concluded that Empire (acting as a fiscal intermediary for the government to process claims made by hospitals) performed its contractual obligations to the government and did not, either expressly or impliedly, submit a false claim. That ruling is consistent with the undisputed testimony of two of the government's own officials involved in the matter.

Relator proffers separate theories for recovery under the FCA against the two Appellants, Defendant-Appellee Huron Consulting Group ("Huron")[3] and Empire. As to Huron, Relator alleges that it caused St. Vincent's Medical Centers in New York[4] to submit false Medicare claims to obtain excessive "outlier" payments from the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"). Outlier payments are made to cover what are considered a provider's excessive costs for treatments. SPA5;

---

[3] This brief throughout refers to "Huron" as including collectively, Huron Consulting Group, Inc., Huron Consulting Group, LLC, and Huron Consulting Services, LLC.

[4] St. Vincent's Medical Centers in New York consisted of numerous entities. The three entities Relator alleges received excessive outlier payments in 2005 and 2006 are St. Vincent's Catholic Medical Center ("SVCMC," provider number 330290), Catholic Medical Center (provider number 330357), and Sisters of Charity (provider number 330028). This brief refers to these three entities collectively as "St. Vincent's."

JA1380-81 ¶ 14.[5]  With respect to his claim against Empire,  Relator alleges that,

as a fiscal intermediary for CMS, Empire acted "recklessly" in failing to detect and

prevent Huron's alleged fraud.

The District Court held that Relator's claims against Empire failed as a

matter of law because:  (1) Huron had not submitted any false claims, and thus

Empire could not be liable for failing to detect a fraud that did not exist, SPA21;

and (2) that, in any event, Empire did not recklessly perform its duties, and Relator

was unable to point to any factually or legally false certification by Empire that

would give rise to FCA liability.  SPA25.

The District Court's summary judgment ruling is correct, but Empire cross

appealed because the District Court lacked subject matter jurisdiction under the

FCA.  Prior to the completion of all discovery, Defendants filed separate motions

to dismiss for lack of subject matter jurisdiction.  Dkt. 89 and Dkt. 92.  The FCA's

public disclosure jurisdictional bar prohibits a Relator from pursuing a claim

"based upon the public disclosure of allegations or transactions" unless the Relator

---

[5] Citations to the Joint Appendix and Special Appendix are indicated herein as JA__ and SPA__, respectively.  For ease of the Court's reference, a table of the primary record sources relied on in this brief, showing the short citation abbreviation, the document referenced, and the location of the document in the appendices, appears on pages ix-xii.  The table also includes a glossary of the main abbreviated terms used in this brief.

4

is the "original source of the information" on which the allegations are based. 31 U.S.C. § 3730(e)(4).

The District Court properly concluded that there is not "any serious question that the allegations and transactions that comprise the Relator's action were publicly disclosed." SPA31. Specifically, the government's responses to Relator's FOIA requests contain the charge information, the cost information, and the amount of outlier reimbursement St. Vincent's received, which Relator testified would "trigger" knowledge of the alleged fraud. SPA31-33. These materials were in the public domain prior to the time in which the Relator filed his complaint. *Id.* Based on the Supreme Court's ruling in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885 (2011), the FOIA responses are publicly disclosed reports under the FCA.

Relator admitted that he had no knowledge of what Empire did to process outlier payments to St. Vincent's. But even his speculation as to why Empire was liable under the FCA is based on publicly disclosed information. Empire, therefore, moved to dismiss Relator's claim based on the FCA's public disclosure bar. Dkt. 92. The District Court, however, concluded that, under the FCA, Relator was an "original source" of the material information in the complaint because Relator allegedly knew of the increased payments to St. Vincent's *and* he believed that Empire's failure to detect the alleged fraud by Huron must be a violation of

5

Empire's contractual duties to CMS.  Thus, the District Court concluded that the

FCA's public disclosure bar did not prevent Relator from pursuing his claim.

SPA41-42.  The District Court's jurisdictional ruling is incorrect and inconsistent

with binding precedent.  Relator acknowledged that he had no knowledge of what

Empire did to process St. Vincent's claims and, at the summary judgment stage,

the District Court properly concluded that Relator's beliefs about Empire's

contractual obligations were incorrect.  *See infra* Part III.  In short, Relator cannot

be an "original source" under the FCA based on inaccurate speculation alone

without independent knowledge of the material facts.  For that reason, Empire has

cross appealed the District Court's denial of the motion to dismiss for lack of

subject matter jurisdiction.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   Medicare Payments To Providers.

#### 1.   How a provider obtains outlier payments.

In order to be paid under the Medicare system, providers submit individual

claims for payment for services (i.e., bills for the treatment of patients) to a

Medicare Administrative Contractor ("MAC") f/k/a Fiscal Intermediary ("FI").

JA1377-78 (Empire's Rule 56.1 Statement of Undisputed Facts ("Fact

Statement")) ¶¶ 1, 6.[6] Empire is an FI, and thus pays claims and processes and audits cost reports for Medicare Part A providers in its regions, which, during the time period at issue in this litigation, included St. Vincent's Medical Centers in New York. JA1378 ¶¶ 2-3. Empire's duties as an FI were set out in Empire's contract with CMS. JA1377 ¶ 4.

Claims submitted electronically, as the claims in question were, are processed, without human review, by a CMS computer system. JA1378 ¶ 6. These payments are based on a predetermined payment to compensate providers for various forms of patient care (the Prospective Payment System ("PPS")). The standard PPS payment, however, is adjusted for certain add-on payments to

---

[6] Relator's Opposition below (Dkt. 133) and his Response to Defendant Empire's Statement of Undisputed Facts ("Relator's 56.1 Response"; Dkt. 132) both failed to cite to specific evidentiary citations as required. Fed. R. Civ. P. 56(e); S.D.N.Y. Local Rule 56.1. As such, the denials should be disregarded. *See, e.g.*, *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (deeming movant's asserted facts admitted where non-movant offered conclusory denials without citation); *see also Holtz v. Rockefeller & Col., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) (discussing role of Local Rule 56.1 to "streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties"). With regard to the summary judgment ruling, unless otherwise indicated, the factual citations in the Factual and Procedural Background section are to facts that Relator "agreed" with, *see* Relator's 56.1 Response (Dkt. 132), or to facts the District Court concluded were not truly disputed. For ease of reference for the Court, and to draw attention to particular evidence, such as the testimony of key government officials, Empire has at times included citations to the underlying evidentiary record, with appropriate Joint Appendix citations when available.

compensate providers for additional costs, one category of which is at issue in this case—"outlier payments," which are discussed in more detail below. *See* JA1379 ¶ 7.

When a provider submits a claim to an FI, the provider includes the charges for the services provided. JA1380-81 ¶ 14.[7] The automated computer system takes these charges and the provider-specific cost-to-charge ratio ("CCR") in the system for that provider and provides a formula to obtain an estimate of the provider's cost of performing these services. JA1380-81 ¶¶ 11-14.

The CCR, as its name suggests, is a ratio of a hospital's costs to its charges. 42 U.S.C. § 1395ww(d)(5)(A)(ii); 42 C.F.R. §§ 412.84(g), (h); SPA216 (CMS Pub. 100-04, Transmittal 1072, Change Request 5286 (Oct. 6, 2006) ("Change Request 5286"), § 20.1.2.1); SPA4. The CCR consists of the hospital's costs for services, which are derived from the hospital's cost report, divided by the hospital's charges in effect for that same cost report period. *Id.*[8]

The automated system also provides for a fixed payment rate for each type of service provided (a diagnosis-related-group or "DRG") and a fixed dollar loss

---

[7] Neither CMS nor the FI plays any role with regard to establishing a provider's charges. JA1230 (Reisman Dep. 23:2-11).

[8] The District Court explained the outlier reimbursement system through a simplified hypothetical. *See* SPA6.

8

amount for each service, both of which are set by CMS. JA1381 ¶ 14. When the provider's estimated cost of performing a service is higher than the sum of the DRG and the fixed dollar loss for that service, the provider automatically receives an "outlier" payment. *Id.* CMS did not expect or require FIs to manually review each claim as it came in or each outlier payment as it was made to the provider. *Id.*

All of these initial payments, including the outlier payments, are made daily, and later the provider's annual cost reports go through a process of tentative settlement, followed by final settlement. JA1378-80 ¶¶ 6, 11; JA1384 ¶ 26. A tentative settlement is an initial review based on cost reports from providers (that are generally provided some time after the end of the calendar year), and results in a "tentative determination of the reimbursement for that year, reconciliation to the payments, and then either a payment or a recovery." JA1232 (Reisman Dep. 64:14-17); *see also* JA1385 ¶ 29. A final settlement is often completed, by CMS design, several years after the costs were incurred. SPA7; *see also* JA1163 (Norwalk Rep. ¶ 28); JA1232 (Reisman Dep. 64:10-11). Final settlement is a retrospective reconciliation of all payments made to the provider for a given year. *See* SPA7-8; 42 C.F.R. § 412.84(i)(4); 68 Fed. Reg. 34, 495, 34,501 (June 9, 2003); *see also* JA1386 ¶ 32 (denied by Relator at Dkt. 132, without specific citation). The final settlement calculated amounts often differ from the tentative settlement amounts because the final settlement is based on a much more complete

9

and accurate review of a provider's claims and costs.  *See generally* SPA4; SPA7-8; JA1385 ¶ 29; *see also* JA1386 ¶ 32 (denied by Relator at Dkt. 132, without specific citation).

### 2.    Calculating outlier payments and cost-to-charge ratios.

According to CMS instructions since 2003, absent express direction from CMS, a provider's CCR is calculated based on a provider's most recently settled cost report—whether either tentatively or finally settled.  SPA22-24; 42 C.F.R § 412.84(i)(2); SPA169-72 (CMS Program Memorandum, Transmittal A-03-058, Change Request 2785 (Jul. 3, 2003) ("Change Request 2785")); JA1382-83 ¶¶ 19-20; JA1352-53 (Reisman Decl.  ¶¶ 23, 32[9]).  FIs update a provider's CCR whenever a more recent year's cost report settlement is issued.  JA1384  ¶ 24.

Given that hospitals submit claims containing charges daily, but only file their cost reports annually, an increase in a hospital's charges will immediately affect the charge component of the outlier calculation, thereby increasing outlier

---

[9] Appellant erroneously included an unsigned copy of the Reisman Declaration in the Joint Appendix.  In the District Court, Empire initially filed this unsigned copy (Dkt. 124), and subsequently corrected the filing with the signed copy (Dkt. 130.) The text of the declaration is the same in both docket entries. Thus, for ease of the Court's reference, citations in this brief are to the unsigned version of the Reisman Declaration appearing at JA1348-59.

payments. JA1384 ¶ 23.[10]  But the same increase in charges will not immediately affect a hospital's CCR because the CCR, as CMS has directed, is recalculated only after the most recent cost report is tentatively or finally settled. *Id.*  During this time lag, before the CCR is adjusted, there is the potential for a hospital to receive increased or excessive outlier payments if its costs have not increased. JA1384 ¶ 23; *see also* JA1165-66 (Norwalk Rep. ¶ 48).

## B. Identifying Cost Reports For Outlier Reconciliation.

Recognizing that some providers could try to take advantage of the time lag by increasing charges, and thereby obtain excessive outlier payments, CMS began issuing guidance to FIs in 2002 to retrospectively review outlier payments and recoup any excessive outlier payments through an outlier reconciliation process. *See, e.g.*, 68 Fed. Reg. 10,420, 10,425 (Mar. 5, 2003); 42 C.F.R. § 412.84(i)(4); SPA8; SPA24; JA1387 ¶ 34; JA1165-66 (Norwalk Rep. ¶¶ 48-50) ("specifically designed to be a retrospective process that would recoup excess outlier payments after they were made, not stop all excess outlier payments from being made in the first place"); JA1352-53 (Reisman Decl. ¶¶ 23, 32).  This reconciliation process takes place during final settlement of a provider's cost report.  SPA8; JA1316-17 (Chamberlain Decl. ¶ 11).  CMS did not require FIs to track or monitor outlier

---

[10] As the District Court noted, Relator's purported dispute as to paragraph 23 of Empire's Fact Statement does not relate to the facts cited here.  SPA5-6 n.3.

payments throughout the year.  JA1381-82 ¶ 15; JA1350 (Reisman Decl. ¶ 7).[11]

As part of the 2002 CMS guidance and updated 2003 CMS guidance regarding outlier payments, FIs were to (a) identify providers requiring reconciliation, and (b) await further instructions from CMS.  SPA8; SPA24-25; SPA164-65 (CMS Program Memorandum, Transmittal A-02-122, Change Request 2500 (Dec. 3, 2002)); SPA169-72 (Change Request 2785); JA1388 ¶ 40; JA1352 (Reisman Decl. ¶ 19).  Empire performed the required analysis and sent CMS lists of providers meeting the criteria specified by CMS, consistent with CMS's expectations.  SPA24-25; JA1387-89 ¶¶ 37-38, 40, 42; JA1351 (Reisman Decl. ¶¶ 14-17); JA1360-61, 1362-73 (Zingaro Decl. ¶¶ 4-5 and Exs. A & B); JA1317, 1320-24 (Chamberlain Decl. ¶ 15 and Ex. A).

After FIs provided these initial lists, CMS instructed FIs to perform the analysis to determine whether a provider's cost report required outlier reconciliation as part of the final settlement process.  *See, e.g.*, SPA24-25; *see also* JA1389 ¶ 43; 68 Fed. Reg. at 10,425; 42 C.F.R. § 412.84(i)(4).  Over time, the criteria used changed slightly, but the overall process fundamentally remained the

---

[11] Relator's 56.1 Response denied the factual accuracy of this statement without specific citation to the record and purported to contest its legal accuracy by reference generally to the June 9, 2003 Federal Register.  The District Court observed that the cited Federal Register section does not contain any requirement for FIs to track outlier payments throughout the year.  SPA17-18.

12

same. *Id.* The FI was instructed to analyze the cost report data and, if it met the criteria, notify CMS, but not issue the final settlement or take any further steps with respect to outlier reconciliation unless and until instructed to do so by CMS. *Id.* Empire appropriately notified CMS each year of numerous cost reports that met the criteria, including the 2005 and 2006 cost reports for St. Vincent's. SPA24-25; *see also* JA1352 (Reisman Decl. ¶¶ 21-22); JA1151 (Korpela Decl. ¶ 10); JA1389-90 ¶ 44 (denied by Relator at Dkt. 132, without specific citation).

### C. Empire's Work With CMS Regarding St. Vincent's.

#### 1. St. Vincent's bankruptcy.

St. Vincent's declared bankruptcy in July of 2005. JA1391 ¶ 54. Empire continued to process ordinary claims payments, including outlier payments to St. Vincent's, during the bankruptcy. This was consistent with CMS's guidance to Empire because FIs were not required or expected to suspend these payments to providers unless CMS or the Department of Justice ordered that claims payments to St. Vincent's be stopped, which did not occur. JA1390 ¶ 45; JA1352-53 (Reisman Decl. ¶ 26). Once St. Vincent's entered bankruptcy, personnel from the CMS Regional Office and the Department of Health and Human Services ("HHS") instructed Empire not to issue any tentative settlement payments for St. Vincent's during the bankruptcy, even if the cost report being settled was for a year prior to the bankruptcy. JA1391-92 ¶¶ 55-59. During the bankruptcy, in accordance with

13

CMS guidance, Empire sent the St. Vincent's 2003 final settlements to CMS and waited for approval from CMS before issuing the final settlement payments. JA1393 ¶ 62; CMS Pub. 100-06, Change Request 2350 (Oct. 18, 2002), *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals /downloads/R12FM.pdf ("Change Request 2350"). CMS did not give Empire the approval to issue 2003 final settlement payments for St. Vincent's until late in the St. Vincent's bankruptcy. JA1393 ¶¶ 63-65.

When St. Vincent's emerged from bankruptcy in September of 2007, CMS and HHS instructed Empire to begin issuing tentative and additional final settlement payments for St. Vincent's. JA 1395 ¶¶ 74-75; JA1355 (Reisman Decl. ¶¶ 46-47). Empire did so. JA1396-97 ¶¶ 81-87.

## 2. Updates to St. Vincent's cost-to-charge ratios.

Generally, FIs are not obligated to update the CCR for a provider in bankruptcy. JA1153, 1155-58 (Korpela Decl. ¶ 16 and Ex. A); JA1353 (Reisman Decl. ¶ 32); SPA21-22. However, the CCR may be updated when, for example, a provider requests it and the update is approved by CMS. *Id.*; JA1169 (Norwalk Rep. ¶ 68).

On October 19, 2006, St. Vincent's sent Empire a letter indicating that the CCR for one provider, St. Vincent's Catholic Medical Center ("SVCMC"), might be incorrect and require an adjustment. JA1394 ¶ 68; JA441. (Of course, as is

14

clear now, SVCMC's charges had increased and, as a result of the bankruptcy and the instructions from CMS for Empire not to settle costs reports during the bankruptcy, the CCR was incorrect and outlier payments to St. Vincent's increased during this time as a result. JA1152-53 (Korpela Decl. ¶ 14).) In response to St. Vincent's letter, pursuant to CMS guidance, Empire contacted CMS and CMS instructed Empire to review the provider's cost report data and adjust the CCR accordingly. JA1394 ¶ 69. Empire reviewed the data on the most recently submitted and accepted cost report it had from SVCMC, responded in December 2006, and updated SVCMC's CCR in January 2007.[12] *Id.* ¶¶ 71-72.

### 3. St. Vincent's 2005 and 2006 outlier payments and outlier reconciliation.

In 2008, St. Vincent's contacted Empire and expressed concerns that it had received excessive outlier payments for the years 2005 and 2006. JA1399 ¶ 96. After discussing this matter with St. Vincent's personnel, Empire alerted CMS to this potential issue. JA1400 ¶ 102. Consistent with the regulatory framework that required only flagging of potentially aberrant outlier payments and ultimately reconciliation after the fact, CMS did not instruct Empire to take any action with

---

[12] Empire's letter to SVCMC in December 2006 indicated that the CCR would be updated at that time. JA 1394 ¶ 71; JA442. Due to a clerical error entering the rate on the incorrect line, the CCR was actually updated in January 2007. JA1394-95 ¶ 72.

15

respect to St. Vincent's outlier payments at that time. *Id.* Instead, CMS requested data on the 2002-2006 outlier payments and CCRs for St. Vincent's, and Empire sent CMS this information. JA1399-1400 ¶¶ 99-101. After reviewing this information, CMS did not instruct Empire to take any action relating to St. Vincent's outlier payments. JA1400 ¶ 101. In late 2008, CMS spoke with St. Vincent's regarding their 2005 and 2006 outlier payments and advised St. Vincent's that CMS had not provided FIs the tools necessary to reconcile outlier payments. *Id.* ¶ 102; JA1357 (Reisman Decl. ¶ 56). As a result, CMS recommended to St. Vincent's that it should reserve funds to repay CMS upon completion of the outlier reconciliation process. *Id.*

After it received the appropriate materials from St. Vincent's, Empire completed desk reviews for all of the St. Vincent's entities for years 2005 and 2006. JA2112-2301. During the final settlement processing of the 2005 and 2006 cost reports for St. Vincent's (which, as a result of the bankruptcy and CMS's instructions to Empire, did not occur until 2009 and 2010), Empire performed the outlier analysis required by CMS to determine whether these cost reports would require outlier reconciliation. JA1397 ¶ 88. Empire notified CMS that these cost reports would require outlier reconciliation. JA1397-99 ¶¶ 89-95 (¶ 89 denied by Relator at Dkt. 132, without specific citation); JA1260 (Reisman Dep. 234:2-7). In these notifications, Empire also indicated that it would not proceed further until

16

receiving approval from CMS to do so.  JA1398-99 ¶¶ 90-95.

No FIs could complete any outlier reconciliations until CMS provided further instructions on how to perform the task and approval to do so.  SPA24-25; JA1151-52 (Korpela Decl. ¶ 11); JA1358 (Reisman Decl. ¶ 60); JA1251-52 (Reisman Dep. 204:22-205:140).  Importantly, CMS did not: (a) issue guidance on how to perform outlier reconciliations until December 2010; (b) provide the computer tool necessary for completion of outlier reconciliations until April 2011; or (c) provide Empire approvals to perform any outlier reconciliations until August of 2011.  *See* CMS Pub. 100-04, Transmittal 2111, Change Request 7192, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/ downloads/R2111CP.pdf ("Change Request 7192"); JA1151-52 (Korpela Decl. ¶ 11); JA 1248-49, 1251 (Reisman Dep. 201:19-202:17, 204:13-21).  Relator now concedes all these points.  Appellant's Brief ("App. Br.") at 53-54.[13]  Accordingly, after the 2003 regulations were implemented and until April 2011, FIs like Empire lacked the ability to complete outlier reconciliations or compute the amount of outlier overpayments.  SPA24-25.  At the time of the District Court decision, Empire was processing the outlier reconciliations for providers flagged between 2002 and 2012, including St.

---

[13] Citations to Appellant's Brief refer to the corrected brief filed with the Court on August 8, 2013, App. Dkt. 113.

Vincent's 2005 and 2006 outlier payments.  JA1401 ¶ 106.

### D.     Work Background Of Relator And Public Disclosure.

Relator Steven Landgraber worked as a consultant for St. Vincent's from July 2005 through January 2007.  JA197 (Landgraber Dep. 7:12-15), JA200-201 (*id.* at 16:19-17:13).  During 2005 and 2006, Defendant Huron Consulting Services LLC, served as a financial adviser to the St. Vincent's hospital system while St. Vincent's was in bankruptcy.  JA199 (Landgraber Dep. 9:4-5).[14]

In his deposition testimony, Relator clarified that his FCA claim against Empire was based solely on his belief that Empire got paid by the government under its FI/MAC contract, but failed to perform its work according to its contractual obligations.  JA468 -72 (Landgraber Dep. 64:19-65:1; 65:12-17; 68:15-70:5); *see also id.* at 68:25-69:2 (stating Relator's basis for some of his assertions regarding Empire's alleged failures were not based on any "specific regulatory mandate of contractual requirement" but just on "a common sense business approach").

Relator conceded that, other than knowing that Empire was the FI for St. Vincent's and that St. Vincent's was paid in 2005-2006 with an outdated CCR, he

---

[14] While Relator worked briefly for Empire in the early 1970s, he has admitted that this work is not related in any way to the present claims.  JA465 (Landgraber Dep. 59:23-60:8).

18

had no knowledge of what Empire did to process, investigate, or report any anomalies with respect to the claims submitted by St. Vincent's. *See infra* Part III.D.2.

Relator obtained information relating to total charges billed and outlier payments to St. Vincent's as a result of FOIA requests, which Relator testified is what triggered his belief that there was wrongdoing by Empire. JA460 (Landgraber Dep. 43:22-44:11); *see also* JA470 (*id.* at 63:8-15 (stating that the "essence" of his claim against Empire was that increase in payments should have made Empire aware that something was wrong)). In addition, there were other public disclosures of the facts which Relator asserts supports his claims. For example, correspondence from St. Vincent's Chief Financial Officer Martin McGahan dated October 19, 2006, and addressed to Empire, disclosed the need to recalculate St. Vincent's cost-to-charge ratios. JA439, 441. Correspondence between Empire and CMS provided CMS data on total outlier payments at the St. Vincent's hospitals for 2005 and 2006. JA1375; JA437-38. Finally, disclosures obtained from SEC and IRS filings, as well as publicized reports about the outlier payment issue, collectively put the government on notice of the issues in this case. Dkt. 97 (Exs. E, F, G, H, I, & J).

## E. Procedural History

Relator filed his First Amended Complaint on December 9, 2009. Dkt. 9.

19

Plaintiff asserted claims under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the New York False Claims Act, N.Y. Stat. Fin § 187, *et seq*.  On August 25, 2010, the District Court dismissed with prejudice the state law claim against Empire and dismissed without prejudice the remaining claims in the First Amended Complaint.  Mem. and Order, dated August 25, 2010 at 6-7.  JA79-80.

On October 6, 2010, Relator filed a Second Amended Complaint reasserting all of the original claims, except for a conspiracy charge.  Dkt. 52.  Defendants filed separate motions to dismiss on October 19, 2010.  Dkts. 53 and 56. Defendants argued in these motions that the record demonstrated that jurisdiction under the FCA was lacking because Relator's claims were based on publicly available information, for which Relator was not an original source.  While agreeing that Relator's claims against Empire were based on publicly available information, the District Court incorrectly concluded that Relator was an original source under the FCA, and thus denied the motions on December 30, 2010. SPA35, 41.  Relator then filed a Third Amended Complaint ("TAC"), on March 18, 2011, which corrected the "Huron" entities named as defendants, and which remains the operative complaint.  JA92-124.

Following the completion of discovery, Empire moved for summary judgment because there was no evidence to support Relator's FCA claims.  On March 5, 2013, the District Court granted Empire's motion.  SPA2-25.  In its

20

summary judgment decision, the District Court found that, when viewing all facts in a light most favorable to Relator, Relator (1) could not demonstrate that Huron had made any false statements and therefore Empire could not be liable under the FCA for any action it took in relation to those statements, and (2) could not establish that Empire violated any law, rule, regulation, standard or contractual provision.

Relator filed a Notice of Appeal of the summary judgment ruling, SPA44, and Appellees cross-appealed the denial of the motions to dismiss for lack of subject matter jurisdiction, SPA45 and SPA46.

## SUMMARY OF ARGUMENT

Relator fails to offer any evidence that Empire submitted a false claim to the government, nor even that Empire has done anything other than act in accordance with its contractual and statutory obligations to CMS.  From the beginning of this case, Relator, acknowledged that he had no knowledge of Empire's processes nor of what Empire did in connection with processing claims submitted by St. Vincent's.  Nonetheless, he has doggedly pursued claims against Empire under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, alleging that Empire submitted false or fraudulent claims for payment to the United States.  He has done so based on what the District Court described as "shifting theor[ies] of recklessness."  SPA23.

21

The tenuous nature of these arguments is compounded by the fact that Relator's entire case against Empire is predicated on an alleged fraud committed by Appellee Huron Consulting Group ("Huron")—a "fraud" that the District Court ruled did not happen. SPA20. Relator alleges that in 2005 and 2006, Huron caused St. Vincent's to "excessively" increase its charges in order to fraudulently submit claims and obtain so-called "outlier" payments to which it was not entitled. *See* JA103 (TAC ¶ 28), JA116-117 (*id.* ¶¶ 51-53), JA2353-59 (*id.* ¶¶ 92-102). Empire, in its capacity as a Medicare fiscal intermediary ("FI"), is alleged to have received St. Vincent's claims and improperly permitted—due to its alleged "reckless" disregard of its duties to CMS—outlier payments to be made to St. Vincent's. JA2353-59 (TAC ¶¶ 92-102). The District Court properly entered summary judgment for Empire as Empire acted appropriately at all times and Relator cannot establish key elements of an FCA claim.

The appeal and cross-appeal raise two fundamental questions. First, there is a question of whether this Court should affirm the District Court's grant of summary judgment for Empire. Second, there is a question of whether the District Court had jurisdiction given Relator's lack of knowledge and the requirements of the FCA. While the jurisdictional issue is a threshold question, Empire begins in Part II below with a discussion of the summary judgment ruling because the evidence addressed there will be informative to the Court's analysis of the

22

jurisdictional issue, which is discussed in Part III.

a. Three primary reasons justify affirmance of the District Court's summary judgment ruling. First, Relator has offered no evidence of any "factually false" claim for payment submitted by Empire. Moreover, if the District Court's ruling with respect to Huron is upheld, there also can be no factual falsity on the part of Empire for failing to detect Huron's fraud.

Second, Relator's theories for imposing liability on Empire for "legally false" certifications of compliance with its contract with CMS are meritless. Relator claimed below that Empire should have utilized tools to recover or prevent overpayments to St. Vincent's, such as recoupment, set-offs, or an administrative freeze of any payments. However, Relator concedes on appeal that the appropriate process is CMS's "reconciliation" process. App. Br. at 53-54. As the District Court correctly determined, that process is retrospective and Empire was prevented by CMS from using it until the process was finalized in 2011, long after Relator claims Empire should have acted. SPA23-24. On appeal, Relator bases his "false certification" claim on an argument that merited only a single, undeveloped, passing reference in Relator's opposition—that Empire should have requested that CMS give it permission to make an "interim" CCR rate adjustment (Dkt. 133 at 19), *in addition* to the reduction of St. Vincent's CCR in late 2006 and early 2007 (Dkt. 133 at 14). *See* App. Br. at 51. That argument was waived and, in any event,

23

the pertinent rules, regulations, and guidance make clear that Empire had no duty to adjust St. Vincent's CCR any earlier than it did. Indeed, the government officials most involved with overseeing the St. Vincent's matter, Mark Korpela and Peter Reisman,[15] have testified that CMS did not expect Empire to act earlier and that Empire could not have adjusted the CCR any earlier than it did.

Third, Empire did not submit or cause to be submitted any false claim and cannot be deemed to have acted either falsely or "recklessly" because its actions were: (1) consistent with a reasonable interpretation of CMS guidance; (2) in accordance with explicit instructions from the government; and (3) fully disclosed to CMS. Each is an independent basis that entitles Empire to judgment as a matter of law.

b. With respect to the cross-appeal, under the FCA, when there has been a "public disclosure of allegations or transactions" upon which the complaint is based, the relator must be an "original source" as to the claims against that

---

[15] Mr. Reisman was the Associate Regional Administrator, Division of Financial Management and Fee for Service Operations of the New York Regional Office, for the United States Department of Health and Human Services Centers for Medicare and Medicaid Services. Mr. Korpela is the Director of the Division of Provider Audit Operations in the Office of Financial Management at the Centers for Medicare and Medicaid Services. Relator never even mentions Mr. Korpela and refers to Mr. Reisman, merely as "[a]nother witness on which Empire relied," (App. Br. at 25), without even acknowledging their positions with CMS or their responsibility for overseeing Empire and the St. Vincent's transactions in question.

defendant in order for the Court to have subject matter jurisdiction. *Rockwell*, 549 U.S. at 463; *see also* 31 U.S.C. § 3730(e)(4).

The District Court correctly determined that Relator's claim against Empire is based on publicly available information, namely documents produced in response to Freedom of Information Act ("FOIA") requests. SPA35-36; *see also Schindler*, 131 S. Ct. at 1892 (federal agency's response to a FOIA request is a "report" under the False Claims Act and therefore can be a "public disclosure" under the FCA). The District Court, however, erred in concluding that Relator was an original source. The Relator's only purportedly relevant knowledge was that St. Vincent's received some payments based on an outdated CCR, paired with Relator's speculation that the payments were "contrary to what regulations required of" FIs. SPA41. That is not sufficient to establish status as an original source under the FCA. Relator had no knowledge of what Empire did or did not do (or what Empire was required to do by contract or regulation) with respect to processing the St. Vincent's claims. Mere (incorrect) speculation is not original source knowledge.

For all of these reasons, discussed in greater detail below, the District Court's grant of summary judgment for Empire should be affirmed or, in the alternative, this Court should reverse the District Court's ruling that it had jurisdiction over Relator's FCA claim against Empire.

25

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews both the district court's grant of summary judgment, and

denial of the motion to dismiss for lack of jurisdiction under a de novo standard.

*See, e.g.*, *Gould v. Winstar Coom's, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012)

(summary judgment standard); *United States ex rel. Kirk v. Schindler Elevator*

*Corp.,* 601 F.3d 94, 104 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885

(2011) (subject matter jurisdiction under FCA).

## II. THE DISTRICT COURT CORRECTLY HELD THAT EMPIRE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE RELATOR CANNOT PROVE ESSENTIAL ELEMENTS OF HIS FCA CLAIM.

To establish a violation of 31 U.S.C. § 3729(a)(1)(A) of the FCA, Relator

"must show that defendant[] (1) made a claim, (2) to the United States government,

(3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment

from the federal treasury." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 695

(2d Cir. 2001). Each element must be satisfied to establish liability. As the

District Court correctly concluded, that cannot be done here.

This Court has recognized three types of "false" claims under the FCA: (1)

factually false claims; (2) expressly false certifications of compliance with federal

law; and (3) implied false certification of compliance with federal law. *Id.* at 697;

*see also* SPA14-15. A "factually false" claim is based on an "incorrect description

26

of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes*, 274 F.3d at 697. A "legally false" certification claim is either expressly false itself or is impliedly false because the claim is submitted and "the statute or regulation 'expressly states the provider must comply in order to be paid,' the provider knows that compliance is required, and the provider submits the noncompliant claim anyway." SPA15 (quoting *Mikes*, 274 F.3d at 698-700). "Liability for a 'legally false' certification will not lie 'when the alleged noncompliance would not have influenced the government's decision to pay.'" SPA15. (quoting *Mikes*, 274 F.3d at 700).

Relator never offered any evidence of Empire submitting a factually false claim. The District Court also correctly held that no claim can be pursued against Empire if there were no "'new 2003 outlier calculation rules' that so clearly countermanded Huron's outlier reimbursements as to make Huron's charges 'false or fraudulent.'" SPA21. Thus, should Huron prevail on appeal, then that would "dispose[] of relator's arguments about Empire, for if there were no false statements by Huron, nothing that Empire did with respect to these statements could render it liable under the False Claims Act." *Id.*[16]

---

[16] Empire does not address in this brief Relator's arguments as to its claims against Huron, which are addressed in Huron's brief on appeal. Notably, Relator cites cases involving conduct prior to the 2003 adjustments to address outlier payments

27

Relator, however, proffers two theories for why Empire should be held liable for "recklessly" performing its contractual duties for CMS based on legal falsity. The first is effectively conceded on appeal and the other was waived below. To the extent that either of these theories are properly before this Court, they both fail as a matter of law.

### A. Empire Had No Obligation, Nor Authority, To Take Additional Actions To Recoup Or Halt Funds Paid To St. Vincent's Prior To CMS's Adoption and Implementation Of The Outlier Reconciliation Procedures In 2011.

Relator's first theory seeks to impose liability on Empire for a failure to act before the reconciliation tool it was required to use was even invented. The focus of Relator's argument on summary judgment in the District Court was the assertion that, despite CMS's failure to adopt the outlier reconciliation process until 2011, Empire should have used certain "tools" to recover or prevent overpayments to St. Vincent's, such as recoupment, set-offs, or an administrative freeze of any payments. Dkt. 133 at 19; *see also* Dkt. 133 at 9, 12-16, 21. On appeal, Relator concedes that the District Court correctly rejected this argument, as he acknowledges that these tools "were designed to be acted upon during routine final

---

for the proposition that a claim involving outlier payments can be pursued "in a case like the one before this Court." App. Br. at 27. In addition to involving pre-2009 conduct, none of those cases involved claims against the FI for failing to detect excessive outlier payments. *Id*. at 27-36 (citing cases).

settlements of cost reports, some years after the cost reports had been filed." App.

Br. at 53-54. He also now agrees that the mechanism for recovery of excess

payments was the "reconciliation process," which CMS implemented only in 2011.

*Id.* Inexplicably, Relator then provides, generally without any citation to the

evidentiary record or governing law, a conclusory list of assertions that Empire

failed to utilize these tools. *See, e.g.*, App. Br. at 66-67 (discussing the alleged

failure to start the "process of recoupment"); App. Br. at 75-77 (repeating

allegations in TAC). At the outset, these assertions should be rejected based on

Relator's failure to cite supporting evidence in the record. *Sioson v. Knights of

Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) (quotations omitted) (affirming

summary judgment after declining the "invitation [for us] to scour the record,

research any legal theory that comes to mind, and serve generally as an advocate

for appellant").[17] This deficiency notwithstanding, none of these assertions has any

merit.

---

[17] As noted above, *see supra* at footnote 6, Relator's Opposition below and his
Response to Defendant Empire's Statement of Undisputed Facts (Dkt. 132) both
failed to cite to specific evidentiary citations as required. Fed. R. Civ. P. 56(e);
S.D.N.Y. Local Rule 56.1. Moreover, this Clourt has no obligation "to perform an
independent review of the record to find proof of a factual dispute." *Amnesty Am.
v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).

### 1. Relator's theory is based on a misinterpretation of the term "overpayments."

Relator's argument is based on his unique, and incorrect, interpretation of 42 C.F.R. § 413.64(i), which provides that: "If on the basis of reliable evidence, the intermediary has a valid basis for believing that . . . [a] provider is insolvent or bankrupt under an appropriate State or Federal law, any payments to the provider will be adjusted by the intermediary, notwithstanding any other regulations or program instruction regarding the timing or manner of such adjustments, to a level necessary to insure that no overpayment to the provider is made." 42 C.F.R. § 413.64(i) (2004).

As the District Court recognized (SPA22-23), the "overpayments" referenced in § 413.64(i) refer to formal overpayments resulting from settlements or recorded on the books, not inchoate sums like potentially excessive outliers that could be ascertained only after the reconciliation process. *See* Medicare Fin. Mgmt. Manual, Ch. 3, § 140.4.2 ("overpayments" result from a tentative or final settlement notice formally communicated to a provider). Thus, as CMS's Mr. Reisman explained in his deposition, these alleged "outlier overpayments" simply did not exist (JA1247-48 (Reisman Dep. 179:25-180:8)) and, in fact, *could not* have existed prior to the completion of the outlier reconciliation process—which could not have occurred until at least 2011. JA1251-52 (Reisman Dep. 204:22-

30

205:14); *see also* JA1257 (*id.* at 210:17-22). According to CMS itself, Empire was required to identify providers with aberrant outlier payments and then await CMS's finalization of the outlier reconciliation process, both of which it did. SPA24-25; JA1387-90 ¶¶ 35-43; JA1260 (Reisman Dep. 234:2-7).

### 2. Empire did not fail to identify aberrant outlier payments.

Beginning in 2003, FIs were asked to identify providers' cost reports with aberrant outlier payments. *See, e.g.,* 68 Fed. Reg. 10420, 10425; 42 C.F.R. § 412.84(i)(4); SPA8; SPA24; JA1387 ¶ 34. The indisputable evidence demonstrates that Empire did so, including identifying St. Vincent's for 2005 and 2006. JA1325-41 (Chamberlain Decl. Exs. B-G); *see also supra* at pp. 12-13 (citing record). As a result, Mr. Reisman of CMS testified that he has "never expressed any concerns to Empire about its flagging providers for outlier reconciliation." JA1352 (Reisman Decl. ¶¶ 20-23); *see also* JA1264-65 (Reisman Dep. 240:22-241:7).

Relator suggests this flagging should have been done sooner. App. Br. at 69. But earlier "flagging" of aberrant outlier payments was not consistent with CMS guidance and expectations. As noted above, the analysis to flag a cost report for outlier reconciliation is performed during final settlement processing. JA1389 ¶ 43; *see also* JA1350 (Reisman Decl. ¶ 10); JA1736 (Chamberlain Dep. 95:24-96:3). At the time St. Vincent's declared bankruptcy, there had not been a final

31

settlement of the 2003 and 2004 cost reports, which is common. *See* JA1392-93 ¶¶ 60-61; *see also* JA1163 (Norwalk Rep. ¶ 28). Due to the bankruptcy, Empire had to get permission from CMS before issuing these final settlements. JA1393 ¶ 62; *see also* JA1806 (Hartmann Dep. 102:10-20); JA1772 (Zingaro Dep. 28:15-23); JA1354 (Reisman Decl. ¶ 38). Empire sent these final settlements to CMS as required, and CMS granted permission to issue the 2003 final settlement payments. JA1393 ¶ 62; *see also* JA1301-1311; Change Request 2350.

Final settlements are completed in chronological order, so the 2005 final settlements could not be completed until the 2004 final settlements were completed. JA1355 (Reisman Decl. ¶¶ 39-40); JA1394 ¶ 67. The 2004 final settlements were completed promptly after St. Vincent's emerged from bankruptcy. JA1396-97 ¶¶ 81-87; JA1318 (Chamberlain Decl. ¶ 19). Once St. Vincent's 2004 final settlements were complete, Empire began work on the final settlements for 2005, flagged them for outlier reconciliation, and held them per CMS's instructions. JA1397-98 ¶¶ 88-92 (¶ 89 denied by Relator at Dkt. 132, without specific citation); JA1260 (Reisman Dep. 234:2-7); JA1325-32 (correspondence with CMS). Per CMS guidance, the same process, including the flagging and holding, was then repeated for the 2006 cost reports. *Id.*; JA1398-99 ¶¶ 92-95; JA1333-41 (correspondence with CMS). Empire therefore identified, as Mr. Reisman noted, the aberrant outlier payments at St. Vincent's to CMS in

32

accordance with, and as required by, CMS guidance. *See, e.g.*, JA1356 (Reisman Decl. ¶¶ 50-52); JA1259 (Reisman Dep. 232:9-13), JA1260 (*id.* at 234: 2-7) ("[Empire] flagged the cost reports for outlier reconciliation and then took the steps they were required to take, which was to notify CMS and wait until there was a means to do the calculation in order to perform it."); *see also* JA1264-65 (Reisman Dep. 240:16-241:7).

Under the CMS system, as confirmed by the very officials who administered the program for CMS, Empire and other FIs were not given the tools necessary to determine whether there were excessive outlier payments and, if so, in what amounts, *until 2011*. *See* JA1357-58 (Reisman Decl. ¶¶ 58-60); JA1251-52 (Reisman Dep. 204:18-205:14), JA1258 (*id.* at 211:11-23), JA1245-46 (*id.* at 177:10-178:8); JA1151-52 (Korpela Decl. ¶ 11); JA1167-68 (Norwalk Rep. ¶¶ 58-59); 42 C.F.R. § 412.84(i)(4); Change Request 7192; *see also* JA1376 (Glorioso Decl. ¶ 10); JA1224 (Norwalk Dep. 27:7-22), JA1228 (*id.* at 63:11-22). FIs were "supposed to wait for the reconciliation process so a correct determination could be made on the outlier." JA1245-46 (Reisman Dep. 177:10-178:8). Relator is, in effect, seeking to impose liability on Empire for failing to use a tool years before the tool was invented.

Indeed, from 2002 until 2011, Empire flagged numerous providers to CMS as requiring outlier reconciliation. JA1398-99 ¶¶ 90-95; JA1351-1352 (Reisman

33

Decl. ¶¶ 14-15, 21). None of these reconciliations could be completed until CMS

provided the tool necessary to perform outlier reconciliations in 2011, and

approved the cost reports for outlier reconciliation in August 2011. JA1358

(Reisman Decl. ¶¶ 59-60); JA1376 (Glorioso Decl. ¶¶ 9-10); JA1737 (Chamberlain

Dep. 98:8-25); Change Request 7192. Even if Empire flagged St. Vincent's 2005

and 2006 cost reports earlier, Empire could not complete the outlier reconciliation,

calculate the amount of any outlier overpayment, or seek to recoup any money

from St. Vincent's for any excessive outlier payments prior to CMS's approval in

August of 2011. SPA24-25 (noting Relator's lack of evidence and "bald

assertions"); JA1358 (Reisman Decl. ¶ 60); JA1251-52 (Reisman Dep. 204:18-

205:14) (FIs, like Empire, were instructed not to attempt to reconcile outlier

payments until CMS provided them with the outlier reconciliation tool in 2011).

Indeed, given the dates of their cost reports, Empire was able to, and did, flag

reports for other entities, like Lennox and Vassar (JA1320-24), but also could not

take any further action with respect to these entities until 2011. JA1358 (Reisman

Decl. ¶ 60); JA1251-52 (Reisman Dep. 204:18-205:14). All of this was consistent

with CMS's guidance and expectations. *See* JA1151-52 (Korpela Decl. ¶ 11).

### 3. Empire did not fail to take steps to recover outlier payments to St. Vincent's.

Relator also has contended that Empire should have taken steps to recover

34

funds, retroactively through some recoupment, or off-set, of outlier payments to St. Vincent's for the years 2005-2006. App. Br. at 77 (citing allegations in TAC). But Empire was "neither required nor expected" to stop individual claims payments, including outlier payments, to St. Vincent's based on its bankruptcy filing. JA1352-53 (Reisman Decl. ¶ 26). These payments are only halted for bankrupt providers if CMS or the Department of Justice specifically instructs the FI to hold the payments—and that was not done here. *Id.*

Moreover, as noted by Mr. Reisman, "CMS guidance indicated that any correction required for these [outlier] payments would be completed at the time of the outlier reconciliation." JA1357-58 (Reisman Decl. ¶ 58); *see also* JA1251-52 (Reisman Dep. 204:18-205:14). In the words of CMS's Peter Reisman, during St. Vincent's bankruptcy, Empire did not have an obligation "to reprocess any outlier payments that had been made to St. Vincent's or attempt to recoup any money paid out as outlier payments to St. Vincent's in 2005 and 2006." JA1354 (Reisman Decl. ¶ 37). "In 2008," once St. Vincent's was out of bankruptcy, "it would not have been appropriate for Empire to take *any action to recoup* outlier payments from St. Vincent's. The outlier payments for these years [2005-2006] had already been made, and CMS guidance indicated that *any correction required for these payments would be completed at the time of the outlier reconciliation*." JA1357 (Reisman Decl. ¶ 58) (emphasis added). As for the "tentative and final

35

settlement payments," made when St. Vincent's emerged from bankruptcy, they were "appropriate . . . prior to the outlier reconciliations for St. Vincent's being completed" JA1356 (Reisman Decl. ¶ 49), and Empire acted in a "timely way," *id.* ¶ 52; *see also* 42 C.F.R. § 412.84(i)(4) (high cost outlier payments are reconciled upon final cost report settlement); SPA211-225 (Change Request 5286).[18]

In other words, "regardless of any actions taken by Empire, Empire could not have settled the 2005 and 2006 St. Vincent's cost reports until August 2011 at the earliest." JA1358 (Reisman Decl. ¶ 60); JA1245-46 (Reisman Dep. 177:10-178:8); JA1737 (Chamberlain Dep. 98:8-25); JA1224 (Norwalk Dep. 27:11-22), JA1228 (*id.* at 63:18-22) (FIs "couldn't do anything vis-à-vis outlier overpayments until CMS gave them instructions which did not happen until 2011"); SPA22-25. Once again, that is a point that Relator now concedes. App. Br. at 53.

### B. Relator Cannot Prevail Based On His Assertion That Empire Failed To Make Earlier Adjustments To The Cost-To-Charge Ratio For St. Vincent's.

Relator's primary argument on appeal is based on the fallacy that Empire had both the duty and capability to examine all hospital claims in real time,

---

[18] Contrary to Relator's assertion (App. Br. at 9), this testimony from the CMS affidavits was not improperly "credited" by the District Court; rather, the evidence was undisputed. SPA24. Relator's reliance on unsupported allegations and conclusory statements is not sufficient to defeat a summary judgment motion. SPA25 (noting Relator's reliance on "bald assertions").

ascertain whether the CCR was likely inflated, and affirmatively make adjustments to St. Vincent's CCR earlier than it did, in 2007. App. Br. at 50-55. This theory was never developed below and was thus waived. It also fails as a matter of law.

### 1. Relator's argument regarding the cost-to-charge adjustment was not developed below and was thus waived.

In the District Court summary judgment briefing, Relator acknowledged that "Empire did reduce the CCR," but made a brief passing reference to the fact that maybe there should have been an earlier "interim rate adjustment." Dkt. 133 at 19. This statement was made without citation to any evidence or to any requirement that Empire request an adjustment to St. Vincent's CCR. Dkt. 133 at 19. This argument is now Relator's primary basis for overturning the District Court's decision with respect to Empire and it is based on a specific regulatory provision that Relator *never* cited in the briefing below, 42 C.F.R. § 412.84(i)(1). Relator in fact faults the District Court for allegedly "completely ignoring" this specific provision, which Relator now calls "perhaps the most important reform of 2003." App. Br. at 54. In fact, after noting that Relator failed to specify the provisions of § 412.84 on which Relator was basing his arguments, the District Court stated that it "reviewed the entire regulation in detail" and found no applicable regulations supporting an FCA violation on the facts of this case. SPA18, 24.

This Court has repeatedly, and appropriately, held that "[a]n appellate court

37

will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (internal quotation and citations omitted) ("[C]ircumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the [parties] below and they proffer no reason for their failure to raise the arguments below.") (citations and quotations omitted); *see also Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) (declining to consider argument mentioned in passing in party's preliminary statement but otherwise undeveloped). Similarly, this Court has held that "[Fed. R. Civ. P. 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute. In addition, we will not consider specific allegations . . . made in . . . submissions to this Court, that [were not made] in the district court." *Lee v. Alfonso*, 112 App'x 106, 107 (2d Cir. 2004) (citation omitted).

Relator's argument regarding the alleged duty of Empire to make an interim adjustment to the CCR is just such an argument. This Court should not permit Relator once again to "shift[] theor[ies] of recklessness" in an attempt to salvage his claim. SPA23. Refusing to allow this new argument is particularly appropriate here, based on the "extremely liberal indulgence the [District] Court has given relator's briefing." SPA25.

38

### 2. Empire was not required to make additional adjustments to St. Vincent's CCR.

Even if Relator sufficiently developed this argument below—and he did not—Empire did not fail to comply with any requirement to adjust St. Vincent's CCR. 42 C.F.R § 412.84(i)(1) provides that CMS "may" adjust a provider's CCR. Absent contrary directions from CMS, the guidance and regulations only require FIs to update the CCR when a more recent year's cost report has been tentatively or finally settled. 42 C.F.R § 412.84(i)(2); SPA169-72 (Change Request 2785). Prior to St. Vincent's entering bankruptcy in 2005, the most recent settlement issued was the 2003 tentative settlement. JA1389 ¶ 55; JA1318 (Chamberlain Decl. ¶ 17). CMS and HHS directed that Empire not issue any tentative settlement payments for St. Vincent's while St. Vincent's was in bankruptcy. JA1353 (Reisman Decl. ¶¶ 28-30). Because no tentative settlements payments were authorized while St. Vincent's was in bankruptcy, and CMS did not approve any 2003 final settlements until late in the bankruptcy, Empire did not adjust the CCR for St. Vincent's during that time period. Nor did CMS instruct Empire to do otherwise. JA1353 (Reisman Decl. ¶ 32), JA1354 (*id.* ¶¶ 35, 38); *see also* SPA163 (CMS Pub. 15-1, Section 2408.2); CMS Pub. 100-06 Ch. 8, Section 90.

There is similarly no support for Relator's suggestion that Empire should have monitored CCRs for St. Vincent's more closely, and acted to reduce the CCR,

39

because of St. Vincent's bankruptcy. Relator's repeated references to "time is of the essence" when a provider is in bankruptcy relies on general regulations requiring FIs to be vigilant regarding providers in bankruptcy, such as 42 C.F.R. § 412.84(i). *See* App. Br. at 53-55. As noted above, this provision addresses preventing "overpayments" to providers in bankruptcy. *See supra* at Part II.A.1. Once again, as the CMS officials have testified, the term "overpayment" in this highly regulated field has a specific meaning, and it was not possible for Empire to know until 2011 whether there was an overpayment or not. *See supra* at Part II.A.1. Moreover, the suggestion that this regulation required Empire to adjust St. Vincent's CCR during the bankruptcy is directly counter to the specific guidance given by CMS. In 2011, CMS issued a Memorandum to address any confusion regarding an FI's requirements when a provider was in bankruptcy. JA1155-58 (the "2011 CMS Memorandum"). CMS instructed that, because cost reports are not tentatively settled in bankruptcy, "if a provider is in bankruptcy, *there is no requirement* for an FI . . . to update the CCR." JA1156 (emphasis added).[19]

### 3. Empire did not breach any duty to notify CMS of the need for an adjustment to St. Vincent's CCR.

An FI may recommend to CMS adjustments to a provider's CCR if the

---

[19] Of course, even if Relator's interpretation were correct, Empire cannot be liable for defrauding the government under the FCA for following CMS's own guidance. *See infra* Part II.D.

provider requests a different CCR or if the FI is made aware of information that the CCR currently being used is not accurate. JA1155-58 (2011 CMS Memorandum). CMS must approve the alternative CCR. *Id.* Relator asserts that if Empire had knowledge that St. Vincent's current CCR was inaccurate, then it was required to seek approval from CMS to adjust the CCR. App. Br. at 58. Relator relies on a passage from a Medicare claims processing manual, revised in late 2006. *Id.* (quoting A-03-508). Again, the 2011 CMS Memorandum makes clear that Empire "may" have requested an adjustment, but was not required to do so for St. Vincent's. JA1156. The 2011 CMS Memorandum states that when "a provider is in bankruptcy," not only is "there no requirement for an FI . . . to update the CCR," but even "if the FI . . . is made aware of information that the CCR currently being used is not accurate, they *may* request that CMS approve an alternative CCR." *Id.* (emphasis added). That was confirmed by CMS administrator Korpela. JA1153 (Korpela Decl. ¶ 16) (FI "may request an adjustment"); *see also* JA1169 (Norwalk Rep. ¶¶ 68, 70); JA1354 (Reisman Decl. ¶ 34). Making such a request is neither a regulatory requirement, nor a condition of payment; as a result, there can be no FCA violation. JA1155-58 (2011 CMS Memorandum). Moreover, Relator has never cited any evidence that Empire "was aware" in 2005 and 2006 that the CCR for all of the St. Vincent's hospitals CCRs required adjustment.

When St. Vincent's notified Empire of a potential issue with the CCR for

41

SVCMC in late 2006 (JA441), Empire promptly notified CMS and appropriately adjusted the CCR prospectively in accordance with CMS guidance.  JA442, JA1394-95 ¶ 72; JA1353-54 (Reisman Decl. ¶ 33-34, 36).  When Empire adjusted SVCMC's CCR, Empire was not under any obligation to "reprocess any outlier payments that had been made to St. Vincent's or attempt to recoup any money paid out as outlier payments to St. Vincent's in 2005 and 2006."  JA1354 (Reisman Decl. ¶ 37); *see also* JA1251-52 (Reisman Dep. 204:18-205:14); Med. Fin. Mgmt. Man. § 140.2.1 (Rev. 10-18-02) ("You should not take any action for or against a debtor until you consult the Regional Office.").  Nor could Empire have done so until, as discussed above, it received direction from CMS in 2011.  *See supra* at Part II.A.3.  In the words of Mr. Korpela of CMS, "*Empire had no affirmative duty to identify the potential for outlier overpayments as they were happening, and to adjust the St. Vincent's CCRs to prevent such overpayments*."  JA1153 (Korpela Decl. ¶ 15) (emphasis added).

### 4. Empire did not fail to perform PS&R reviews and desk audits.

In support of his argument that Empire should have taken some action earlier, including adjusting the CCR, Relator asserts that Empire knew or should have known of the alleged Huron fraud based on review of PS&R data and/or desk audits.  App. Br. at 29, 38-41.  Relator never offered any evidence to support these

42

assertions.

Relator argued below that Empire was reckless because it "did not bother" to perform desk review audits of St. Vincent's 2005 and 2006 cost reports. Dkt. 133 at 20. When Empire pointed out that the desk reviews were indeed performed and had been produced to Relator in discovery, Relator's counsel admitted at oral argument that he had not bothered to review all of the documents produced. JA2327 at 26:10-25. He then shifted tactics, arguing that the desk reviews were not adequately performed. JA2328 at 27:1-4. The District Court properly rejected this argument as a basis for an FCA claim. SPA23-25.[20]

While on appeal Relator attempts to make much of what the desk reviews disclosed, Relator fails to explain how desk reviews would have led to adjusted CCRs for St. Vincent's in 2005 or 2006.[21] Desk Reviews cannot be completed

---

[20] Relator has previously asserted, without citation to evidence, that Empire had everything in 2005 and 2006 to support adjusting the CCR then. Dkt. 133 at 14. That is not true. The information necessary was not available until the final cost reports (as amended) were sent beginning in late 2006 (JA2109 (Chamberlain Supp. Decl. ¶¶ 3-8)) and even then Empire could not complete tentative or final settlements necessary to adjust the CCR. Nor, in any event, was Empire *required* to do so. JA1353 (Reisman Decl. ¶¶ 28-32), JA1354 (*id.* ¶¶ 35, 38), JA1355 (*id.* ¶ 43); JA1152 (Korpela Decl. ¶ 13), JA1153 (*id.* ¶ 16).

[21] Relator notes that the desk reviews reveal an increase in charges, and suggest that the very forms themselves provided warnings to Empire about outlier reimbursements. *See* App. Br. at 40-41. Despite Relator's notes regarding the years for which the desk reviews were completed (some limited and some full desk reviews), Relator offers no evidence that gives rise to "recklessness" and he

43

until the cost reports are received from the providers; i.e., long after the initial

automatic outlier payments have been made.  JA1380 ¶ 11; JA1384 ¶ 26.

Empire did not receive even the initial 2005 SVCMC cost report, necessary

for the desk reviews, until December of 2006, at which point the CCR for SVCMC

was already being adjusted.  JA1394-95 ¶¶ 68-72; JA2109 (Chamberlain Supp.

Decl. ¶ 3).  Similarly, Empire received an amended cost report from Sisters of

Charity in November 2006.  JA2109 (Chamberlain Supp. Decl. ¶ 8).  By Relator's

own admission, the CCR adjustments in 2007 stopped the excessive outlier

payments.   Dkt. 133 at 13.  St. Vincent's amended the 2005 cost reports for

SVCMC and Catholic Medical Center in March of 2008.[22]  JA2109 (Chamberlain

Supp. Decl. ¶¶ 4, 6).  Empire completed the desk reviews of these cost reports

within months of receiving them.  JA2112-63.  Again, after the desk reviews were

---

ignores the fact that these reviews were performed well after it could have had any
impact on the initial outlier payments to St. Vincent's in 2005 and 2006.  *See*
JA2108 (Chamberlain Supp. Decl. ¶¶ 3-8); JA1791 (Hartmann Dep. 44:8-18).

[22] The 2006 cost reports for these two entities were amended in October and April
2009, respectively, and they were reviewed under a similar timeline.  JA2109
(Chamberlain Supp. Decl. ¶¶ 5, 7).  While Relator suggests that the October 19,
2006, letter regarding the CCR for SVCMC, should have triggered investigation of
the other St. Vincent's facilities, he has never explained why a voluntarily
provided, and "vaguely worded letter" (SPA42 n.4) about one facility, would
necessarily trigger concerns that there was an allegedly secret fraud ongoing at the
other St. Vincent's facilities.  Nor does he explain why this would have made any
difference given that Relator claims that the alleged fraud was only in 2005 and
2006.  *See*, *e.g.*, JA93-94 (TAC ¶¶ 1-2), JA117 (*id.* ¶ 53).

44

completed, Empire continued on to the next step, began the final settlement

process for these cost reports, and notified CMS of the outlier issues with St.

Vincent's. Empire was instructed by CMS not to make estimates of any

potentially excessive outlier payments prior to the final cost report settlement

process. JA1250-52 (Reisman Dep. 203:23-205:14), JA1918-*20* (*id.* at 221:9-

223:9). Mr. Reisman testified that the notice was "*timely.*" JA1356 (Reisman

Decl. ¶ 52) (emphasis added). Relator is unable to cite to any regulation or

contractual provision demonstrating that earlier desk reviews were required.

 With respect to the electronic PS&R data, Relator suggests, again without

citation, that it was manually monitored by Empire in real time, and thus should

have disclosed the alleged fraud. App. Br. at 29, 60. But that is not how the

process works. Both Mr. Korpela and Mr. Reisman of CMS testified flatly that

there was no CMS *requirement* for Empire to monitor electronic PS&R data on a

real time basis. JA1350 (Reisman Decl. ¶ 7) (FIs "record but are not required to

track the total amount of outlier payments for a year as the outlier payments are

being made."); *see also id.* ¶ 6; JA1262-63 (Reisman Dep. 238:18-239:4), JA1941-

42 (*id.* at 244:6-245:16); JA1153 (Korpela Decl. ¶ 15).

 Moreover, even Relator's expert concedes that charge data in the PS&R

reports, without more, were *not* sufficient to alert Empire to any issue regarding the

existence of excessive outlier payments or the need to adjust the CCR; rather, both

charge and *cost* data were needed to determine the appropriate CCR. JA2089-2093 (Yospe Dep. 236:4-240:3).[23] Even to estimate the amount of outlier overpayment, internal data on the hospital's costs and expenses were necessary; but such data were not shared with Empire at the time and were only available to Empire when it later received St. Vincent's cost reports. *See* JA1004-06 (Yorke Dep. 8:20- 15:10), JA1294 (*id.* at 166:2-20).

In short, Empire did desk reviews for all of the St. Vincent's entities. *See, e.g.*, JA2112-2301. Empire also did charge comparisons as part of the full desk review, as appropriate. JA2109 (Chamberlain Supp. Decl. ¶ 11), JA2110 (*id.* ¶ 13); JA2162-63, 2204-05 (desk review documentation); JA1803 (Hartmann Dep. 91:23-92:5 92:24-93:5), JA1811 (*id.* at 124:5-14) (explaining when charges were compared). Quite tellingly, a CMS performance review indicated no deficiencies with respect to Empire's desk review process. JA1235 (Reisman Dep. 75:7-15).

---

[23] Mr. Yospe testified that, without the 2005 cost reports, Empire did not have the necessary information to adjust the CCR. JA2089-2093 (Yospe Dep. 236:4- 240:3). Empire did not receive the St. Vincent's 2005 cost reports until late 2006, and it adjusted the CCR by early 2007. JA1394-95 ¶¶ 68-72. Thus, as Yospe acknowledged, there were only a few months between receiving the 2005 cost reports in late 2006 and implementing the CCR adjustment in early 2007 during which Empire could have taken action, which it in fact did. JA2089-2093 (Yospe Dep. 236:4-240:3).

**C.    Relator Cannot Prevail On His New Assertions That Empire Recklessly Failed To Perform Other Required Tasks Under Its Contract With CMS.**

On appeal, Relator seeks to supplant the judgment of the CMS contracting officials and the District Court with vague, unsupported assertions that Empire failed to discharge certain other contractual duties. *See* App. Br. at 67. In particular, Relator now asserts that Empire failed to monitor whether the services provided to a patient at St. Vincent's were covered services, and the amount of payment required to be made. *Id.* Relator also asserts that Empire failed to ensure that St. Vincent's had an agreement with, and used, a quality control peer review organization concerning proper charges, and that Empire failed to ensure that outlier payments were only made for medically necessary procedures. *Id.* Relator has not offered any evidence to support any of these assertions. Moreover, Relator never raised these issues in the summary judgment briefing below. In addition to being waived, these theories ignore the realities of the process that was implemented by CMS and administered by Empire with CMS's full understanding and approval. They therefore cannot serve as the basis for overturning the District Court's summary judgment ruling. *See supra* at Part II.B.1 (citing cases).

**D.    Relator Did Not And Cannot Demonstrate The "Knowingly" Element Of A False Claim.**

Reckless disregard under the FCA requires a showing of intent beyond mere

47

negligence. *Mikes*, 274 F.3d at 703 (intent under the FCA is not "negligence or innocent mistake"); *see also United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999). As the District Court held, Relator cannot show that Empire recklessly disregarded any actual obligation it had to CMS, and in fact Empire acted consistent with CMS guidance. SPA24-25. Where a government contractor acts in accordance with explicit instructions from the government, that contractor has not acted recklessly. *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("We decline to hold [defendant] liable for defrauding the government by following the government's explicit directions.").

In addition, in light of the statutory language and the testimony of the CMS officials responsible for this aspect of the Medicare program, Empire's interpretation of what it was and was not required to do was clearly reasonable and thus cannot support an FCA violation. As the Supreme Court held in interpreting the "recklessness" requirement in a different context, a defendant "does not act in reckless disregard of [a statute] unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the [defendant] ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69. The Court went on to conclude that the defendant's reading of the statute was not "objectively unreasonable" because,

48

even though rejected by the Supreme Court, the defendant's interpretation of the statute had been adopted by other courts and there was no contrary guidance "that might have warned [defendant] away from the view it took." *Id*. at 70. At worst, the same is true here for Empire's conduct. It therefore cannot be the basis of an FCA violation.

The reasons for affirming here are similar to those in *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008). There, the court affirmed the grant of summary judgment in defendant's favor because the relator: "never explains why [defendant's] interpretation . . . was unreasonable, much less why its interpretation constituted reckless disregard. While the unreasonableness of [defendant's] interpretation is merely evidence, the absence of which does not preclude a finding of knowledge, . . . [the relator] points to nothing else 'that might have warned [the defendant] away from the view it took.'" *Id.* at 983 (quoting *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201 (2007).[24]

---

[24] *See also United States ex rel. Williams v. Renal Care Grp., Inc.,* 696 F.3d 518, 520-21, 528-31 (6th Cir. 2012); *United States ex rel. Farmer v. City of Houston,* 523 F.3d 333, 342 (5th Cir. 2008); *Visiting Nurse Ass'n of Brooklyn v. Thompson,* 378 F. Supp. 2d 75, 96 (E.D.N.Y. 2004) (citing *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996), for the proposition that "as a general rule, unresolved disputes about the proper interpretation of a statute or

49

Far from recklessly disregarding its obligations, as evidenced by the statements and testimony of Reisman, Korpela and Norwalk, Empire's interpretation of what it was supposed to do was reasonable and, in fact, was in harmony with CMS's guidance and expectations for FIs.[25] The fact that the overseeing government agency has not expressed any concerns and continued to pay the defendant under its contract after a FCA lawsuit was filed is a factor in refusing to find defendant acted "knowingly." *See K & R Ltd. P'ship*, 530 F.3d at 984.

Finally, Empire fully disclosed to CMS the very information Relator argues was false or fraudulent: that St. Vincent's received significantly higher outlier payments in 2005 and 2006 than it had in 2004, that these outlier payments might have been excessive, and that Empire was sending settlement payments to St. Vincent's once St. Vincent's was out of bankruptcy. *See supra* at Part II.B.3. This further demonstrates that Empire did not act with the required intent. *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir.

---

regulation should not lead to suits under the FCA, at least where a claimant's interpretation of the governing law is reasonable").

[25] JA1350 (Reisman Decl. ¶¶ 6-10), JA1351 (*id.* ¶¶ 16-17), JA1352-53 (*id.* ¶¶ 22, 26), JA1357 (*id.* ¶¶49, 52) JA1359 (*id.* ¶ 62); JA1150-51 (Korpela Decl. ¶¶ 6, 8, 10), JA1153 (*id.* ¶ 15); JA1161 (Norwalk Rep. ¶ 16), JA1165 (*id.* ¶¶ 44-47), JA1168 (*id.* ¶¶ 60-62), JA1169-74 (*id.* ¶¶ 68-72, 84-87, 90-100).

50

1993) (defendant's disclosure to government of the relevant information was evidence against a finding of scienter).

Specifically, in 2008, Empire notified Mr. Reisman at CMS that there was a potential issue with St. Vincent's outlier payments. JA1400 ¶ 102; JA1357 (Reisman Decl. ¶ 56); JA1250-51 (Reisman Dep. 202:23-203:6). Empire also sent Mr. Reisman the outlier and CCR information for the 2002-2006 St. Vincent's cost reports. JA1356-57(Reisman Decl. ¶¶ 53-55); JA1053-54. Mr. Reisman did not instruct Empire to take any action in response to this notification or after reviewing this data. JA1356-57 ¶¶ 55, 57. Later, Empire again informed CMS of potential issues with St. Vincent's outlier payments when Empire flagged these entities for outlier reconciliation. JA1356 (Reisman Decl. ¶ 50); JA1325-1341. Again, CMS did not instruct Empire to take any action until 2011.

When St. Vincent's emerged from bankruptcy, Empire asked permission to issue tentative and additional final settlement payments to St. Vincent's and CMS granted this permission. JA1355 (Reisman Decl. ¶ 46); JA1051-52. This was after Empire had already informed CMS of the 2006 CCR adjustment for SVCMC, which alerted CMS that the CCR had been reduced. JA1353-54 (Reisman Decl. ¶ 33). Empire's openness and frequent dialog with CMS on all of these issues establishes that Empire did not "knowingly" breach its obligations. On the contrary, it conclusively demonstrates that it is reasonable to believe that Empire

51

performed in accordance with CMS's guidance and expectations. *Accord United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1222 (10th Cir. 2008) ("It would . . . be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures").

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT IT HAD SUBJECT MATTER JURISDICTION UNDER THE FALSE CLAIMS ACTS.

As the foregoing demonstrates, there simply was no fraud or false claim by Empire, and Empire communicated about St. Vincent's situation with CMS and acted in accordance with CMS instructions and guidance. There is, therefore, no FCA violation. Before the Court would ever need to get to that point, however, it is evident that subject matter jurisdiction under the FCA is lacking in this case. The only thing that Relator "knew" about the putative "fraud" committed by Empire was that payments to St. Vincent's had gone up in 2005 and 2006 and that an old CCR was used. These facts were disclosed through a response to a FOIA request. Thus, even though the undisputed facts show that there was no FCA violation (nor could there be), the only facts that Relator was ever able to cite as a basis for his claim were publicly disclosed and he was not an original source of that information. Therefore, under the applicable FCA provisions, the jurisdictional requirements are not satisfied.

52

**A.    There Is No Jurisdiction Under the FCA If There Has Been A Public Disclosure And Relator Is Not An Original Source.**

Under the False Claims Act, federal courts lack subject-matter jurisdiction over suits based on "allegations or transactions" that have been "public[ly] disclos[ed]" unless the relator "is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986).  As stated in the FCA:

> (A)    No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B)    For purposes of this paragraph, "original source" means an individual who had direct and independent knowledge of the information on which the allegations are based and had voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (1986).

This language in the FCA was first inserted in 1986 and was amended in 2010.  *See* Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 10104, 124 Stat. 119, 901 (2010).[26]  The United States Supreme

--------

[26] The 2010 amendment modified the provision designating a "criminal, civil, or administrative hearing" a public disclosure, now requiring that (1) the criminal, civil, or administrative hearing be a federal hearing; and (2) the Government or its agent be a party to the hearing, thus excluding purely private litigation. 31 U.S.C.

Court has made clear, however, that the 2010 amendment is not retroactively applicable to qui tam actions pending at the time of amendment. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) ("The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit."). Relator's Complaint was first filed on December 9, 2009. Dkt. 6. Thus, the 1986 version of the False Claims Act governs the determination of whether the allegations have been publicly disclosed for complaints filed before the 2010 amendment became effective and whether Relator is an original source.

### B. Relator Bears The Burden Of Demonstrating That FCA Section 3730(e)'s Jurisdictional Limitation Is Satisfied.

A threshold question in an FCA case is whether the statute bars jurisdiction. *See United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 727 (1st Cir. 2007). Relator bears the burden of proof in demonstrating that federal subject-matter jurisdiction exists. *United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 449 (S.D.N.Y. 2001) (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). In considering this issue, the Court should strictly

_____

§ 3730 (e)(4)(A)(i) (2010). The PPACA also modified the FCA's original source exception to the public disclosure bar in Section 3730(e)(4)(B).

construe the FCA's public disclosure bar and resolve any doubts against federal jurisdiction existing. *See, e.g., United States ex rel. King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001); *United States ex rel. Poteet v. Lenke*, 604 F. Supp. 2d 313, 318 (D. Mass. 2009).

This Court has held that FCA's public disclosure and original source requirements in Section 3730(e)(4) require courts to follow a two-part test for establishing jurisdiction: (1) determine whether the allegations or transactions on which the qui tam action is based were publicly disclosed in one of the ways listed in the statute, *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir. 1992); and (2) if so, then determine whether the relator qualifies as an "original source," *id.* at 322 n.3.

In making these determinations, the "elements of the fraud allegation need not have been made public in a single document." *United States v. Catholic Healthcare W.*, 445 F.3d 1147, 1152 (9th Cir. 2006). They can come from multiple sources that, "considered as a whole," *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 n.8 (5th Cir. 2004); *see also Dingle v. Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004), are sufficient to "set the government squarely on the trail of fraud such that it would not have been difficult for the government to identify [the defendant] as a potential wrongdoer." *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 538 F. Supp. 2d 367, 383 n.10 (D.

55

Mass. 2008) (internal quotation marks and citations omitted).

### C.   The District Court Correctly Held That Relator's Allegations Against Empire Are Based On Publicly Available Information.

The evidence in this case, including Relator's own testimony, demonstrates that the claim against Empire is based on information publicly disclosed prior to the filing of the complaint.  The public disclosure bar applies even if the complaint is not based "solely" on public material.  *Kreindler*, 985 F.2d at 1158.  Qui tam actions are barred under the FCA if "based in any part upon publicly disclosed allegations or transactions" unless the relator is an original source.  *Id.* (quoting *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 553 (10th Cir. 1992)).  The relator need not use the publicly available information—although here Relator admittedly did, *see infra* Part III.C.1—"public disclosure of the allegations divests district courts of jurisdiction over qui tam suits, regardless of where the relator obtained his information."  *Kriendler*, 485 F.2d. at 1158 (quoting *John Doe*, 960 F.2d at 324).

### 1.   Relator's complaint is based on government reports obtained through FOIA requests, which are public disclosures.

The District Court found that Relator's claims against Empire were based on publicly disclosed documents, obtained through FOIA requests.  SPA34-35.  "It is not necessary for someone to know the precise CCR used by Empire in its 'pricier

56

model,' as plaintiff argues. The transactions underlying the fraud that were disclosed with the FOIA data were sufficient that a person relying solely on the FOIA data could infer that fraud had been committed." SPA35 (citations omitted). Indeed, throughout his deposition, Relator admitted that the claims are based on this FOIA information. JA458-461 (Landgraber Dep. 41:23-46:11), JA463-464 (*id.* 57:5-58:12).[27] For example, Relator explained that materials included in support of paragraphs 73-76 of the TAC relating to the total charges billed to Medicare and the Medicare outlier payments were obtained as a result of a FOIA request. *See, e.g.*, JA459-60 (Landgraber Dep. 42:21-43:21).

The FOIA material included documents showing an increase in Medicare outlier payments to St. Vincent's in the 2005 and 2006 period, going from approximately $5.3 million in 2003 and 2004, to $19.79 million in 2005 and $19.3 million in 2006. JA460 (Landgraber Dep. 44:13-21). In 2007, the outlier payments were only $4 million. *Id.*

Based on these figures, Relator testified that the increase in Medicare Outlier Payments to St. Vincent's in 2005 and 2006, followed by a "return to their normal

---

[27] As noted above, Relator testified that he relied on information obtained through FOIA requests to support his allegations. The response to Relator's FOIA requests was voluminous and consisted of cost reports, PS&R reports and other data. To avoid burdening the District Court , samples of these voluminous records were submitted in the record. Dkt. 91 (Salcido Decl. Ex. K); Dkt. 97 (Simon Decl. Ex. D).

level," according to Relator, "would indicate something happened in those two years.  I would want to investigate."  JA460 (Landgraber Dep. 44:6-8).  In other words, according to Relator's own testimony, the facts which give rise to his allegations were contained in the publicly disclosed documents.

This information is Relator's sole basis for including an FCA claim against Empire.  JA607 (Landgraber Dep. 44:13-21); Dkt. 97 (Simon Decl. Ex. D); *see also* JA467 (Landgraber Dep. 63:8-15).  The following exchange from Relator's deposition makes that point clear:

> Q.  Is that sort of the essence of your claim against Empire essentially given the numbers that resulted it was obvious to you there was something wrong and it should have been obvious to them?
>
> A.  Yes.
>
> Q.  Do you have anything else besides that to support your claim?
>
> A.  No.

JA467 (Landgraber Dep. 63:8-15).

The United States Supreme Court made clear that a federal agency's response to a request for records under the Freedom of Information Act ("FOIA") constitutes a "report" within the meaning of the False Claims Act.  *Schindler Elevator Corp*., 131 S. Ct. at 1892.  Therefore, if an allegation or transaction is disclosed in a record attached to a FOIA response, it is disclosed "in" that FOIA response, and therefore, disclosed "in" a report for the purposes of the public

58

disclosure bar under the FCA. *Id.* The District Court therefore correctly held that the material elements of Relator's claim were publicly disclosed. SPA31-35.

> ## 2. There were other public disclosures, in addition to the FOIA information.

In addition to the FOIA information,[28] Relator was aware that a letter had been drafted in 2006 by St. Vincent's to Empire, informing Empire of issues relating to St. Vincent's charge structure (although he did not see the letter). JA457-458 (Landgraber Dep. 40:19-41:12). The letter stated:

> As you know, SVCMC filed for chapter 11-bankruptcy protection on July 5, 2005. Because of that filing, the 2004 Medicare cost reports for each of our regions [have] not been tentatively settled. It has come to our attention that SVCMC hospitals are receiving outlier payments based on prior year cost-to-charge ratios. As a result, the cost to charge ratio may not have been adjusted properly and may result in an incorrect outlier payment.
>
> It is our understanding that audits of prior years have been placed on an expedited schedule in order to settle the 2004 cost report. While this process is occurring, we would like to request a re-calculation of the RCC [cost-to-charge ratio] to avoid any incorrect payment of the outlier.

---

[28] The letter, from St. Vincent's Chief Financial Officer Martin McGahan, dated October 19, 2006, was sent to Steve Hartmann, the Director of Empire Medicare Services. JA441.

JA441.  As discussed above, in response to this correspondence, Empire

investigated the issue and revised SVCMC's cost-to-charge ratio.  *See* JA442; *see*

*also supra* at Part II.B.3.[29]

As CMS's fiscal intermediary, Empire acts as an agent for the Government.

*See Cohen v. Empire Blue Cross & Blue Shield*, 176 F.3d 35, 42 (2d Cir. 1999).

Reports to a Medicare fiscal intermediary constitute public disclosures under the

FCA.  *See, e.g., United States ex rel. Olenick v. Presbyterian Intercommunity*

*Hosp.*, No. CV06-4668-ABC (SSx), 2008 U.S. Dist. LEXIS 109635, at *14 (C.D.

Cal. June 16, 2008) (yearly cost reports submitted by Medicare providers to

Medicare fiscal intermediary for annual audit constituted public disclosure).  St.

Vincent's 2006 letter to Empire reporting the need to recalculate the CCR is

therefore treated as a "public disclosure" to the government under FCA Section

3730(e)(4)(A).[30]

---

[29] That the public disclosure was initially made to Empire and that Empire is a
defendant in this case does not alter the public disclosure status.  There are no
allegations that Empire was in a conspiracy with Huron or St. Vincent's and the
Relator has testified that he has no direct and independent knowledge of what
Empire did in response to the St. Vincent's letter.  Thus, this disclosure should be
treated as any other report to a governmental agency under the FCA.

[30] *See id.*; *see also United States ex rel. Reagan*, 384 F.3d at 174-75 (same); *United
States ex rel. Cosens v. Yale-New Haven Hosp.*, 233 F. Supp. 2d 319, 327 (D.
Conn. 2002) ("Disclosure of information to a competent public official, about an
alleged false claim against the government we hold to be a public disclosure within
the meaning of § 3730(e)(4)(A).") (citing *United States v. Bank of Farmington*,

In addition to the St. Vincent's letter, Empire itself provided a report to CMS in 2008 setting forth the total outlier payments to St. Vincent's for 2005-2006, and raised flags in 2009 about excessive outlier payments—again, well before Relator filed his complaint. *See* JA1398 ¶ 90; JA437-38 (Glorioso Decl. ¶ 4, Ex. B).

Relator also testified that he relied on other public disclosures such as SEC and IRS filings as a basis for the allegations in the complaint. *See* JA107-112 ¶¶ 39-41; *see also* JA609 (Landgraber Dep. 51:4-11). There was also, as early as 2002, significant publicity regarding attempts in the industry to significantly inflate outlier payments (sometimes called "turbo-charging"). *See, e.g., United States ex rel. Lam v. Tenet Heathcare Corp*., 481 F. Supp. 2d 673, 679¬80 (W.D. Tex. 2006) (noting coverage of outliers in the New York Times, the Los Angeles Times, the Wall Street Journal, the Philadelphia Enquirer, and the Dallas Morning News); *see also* Dkt. 97 (Simon Decl. Exs. E, F, G, H, I, & J (published articles discussing the issue)). This type of media coverage can trigger the FCA's disclosure bar: if the disclosure can "set the government squarely on the trail of the alleged fraud without [the relator's] assistance." *United States ex rel. Fine v. Sandia Corp*., 70

---

166 F.3d 853, 861 (7th Cir. 1999)), *rev'd on other grounds*, *United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263 (2d Cir. 2006).

F.3d 568, 571 (10th Cir. 1995).[31]

These collective disclosures demonstrate that all the information underlying Relator's complaint against Empire was in the public domain. That is particularly true when coupled with the 2006 St. Vincent's letter and the information obtained through FOIA requests. *See Kreindler*, 985 F.2d at 1158 (the public disclosure bar has been interpreted broadly, and it precludes "qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator") (quoting *Doe*, 960 F.2d 322).

**D.    Relator Is Not An Original Source Of The Allegations In The Complaint As To Empire.**

**1.    Relator must have direct and independent knowledge of the information upon which the claim is based.**

As noted above, where there have been public disclosures, there is no jurisdiction over an FCA claim unless Relator qualifies as an "original source" for

---

[31] *Accord United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) (citations omitted) (interal quotations and citations omitted) ("Industry-wide public disclosures bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures . . . where a public disclosure has occurred, [the government] is already in a position to vindicate society's interests, and a qui tam action would serve no purpose."); *In re Natural Gas Royalties Qui Tam Litig.*, 562 F.3d 1032, 1042-43 (10th Cir. 2009) (where government can identify defendants based on government's own records, information qualifies as a public disclosure); *United States ex rel. Findley v. FPC-Boron Employees' Club,* 105 F.3d 675, 686 (D.C. Cir. 1997) ("[T]he information in the public domain was sufficient to enable the government to bring suit against [the defendant] without [relator's] involvement.").

the claim against Empire. 31 U.S.C. § 3730(e).[32] This requires that Relator have "direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B). Relator's own testimony demonstrates that he is not an original source with respect to his claims against Empire.

In order for a relator's knowledge to be "direct and independent," the relator must be the "'source of the core information' upon which the *qui tam* complaint is based," and have voluntarily provided that information to the government before filing a complaint. *United States v. N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (citation omitted); *see also Rockwell*, 549 U.S. at 470-71 ("direct and independent knowledge" of all of the "information upon which the relators' allegations are based"); *In re Pharm. Indus. AWP Litig.*, 538 F. Supp. 2d at 379 ("definition [is] conjunctive, requiring the relator to have both 'direct' and 'independent' knowledge"). "To establish original source status knowledge, a qui tam plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *In re Natural Gas Royalties*, 562 F.3d at 1045 (internal

---

[32] Relator has never disputed that being an original source solely for the claim against Huron would not enable him to pursue his claim against Empire. *See generally Rockwell*, 549 U.S. at 463 (dicussing need to original source for claim).

quotation marks and citations omitted); *see also N.Y. Med. Coll.*, 252 F.3d at 120-121. This Court has held that to be an original source, "a plaintiff also must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based." *United States ex rel. Dick v. Long Island Lighting*, 912 F.2d 13, 16 (2d Cir. 1990).[33]

"Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim." *Rockwell*, 549 U.S. at 476. Further, "[s]econdhand information, *speculation*, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge." *In re Natural Gas Royalties*, 562 F.3d at 1045 (emphasis added). In addition, "[t]he fact that a relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient." *Id.*

### 2. Relator lacks the required direct and independent knowledge as to Empire's conduct.

The District Court correctly held that Relator "needs to show . . . direct and

---

[33] The District Court, though recognizing that "no court in this Circuit has yet declared it abrogated," held that *Long Island Lighting* was abrogated by the Supreme Court in *Rockwell*. SPA39. The District Court also stated that even under *Long Island Lighting*, Relator could satisfy this test because he made the FOIA request. SPA39-40. Of course, such a ruling would wholly undermine the original source requirement as interpreted in *Long Island Lighting*, because it would make any person who makes a FOIA request an "original source."

independent knowledge of what Empire *did* with the charges it received from St. Vincent's." SPA41. However, the District Court erred when it ruled that it was sufficient that "Landgraber stated that he personally learned from inquiries that Empire was using a CCR from 2002 to process St. Vincent's 2005 claims, a ratio that would clearly overcompensate given the gross inflation of St. Vincent's charges, and a ratio that, he alleges, was also contrary to what regulations required of financial intermediaries." SPA41 (citing JA547 (Landgraber Decl. ¶ 59); JA465-66 (Landgraber Dep. 60)); *see also* JA2354-2366 (TAC ¶¶ 93-116).

The evidence in this case demonstrates that Relator cannot meet his burden of demonstrating that he has required direct and independent knowledge regarding the FCA claim against Empire. He needed sufficient knowledge of the facts relating to Empire's conduct.

First, Relator testified that he did not deal directly with Empire or have any direct communication with anyone from Empire in connection with his work for St. Vincent's. JA465-66 (Landgraber Dep. 60:9-61:7). Relator does not have knowledge of any false statements by Empire. JA469 (*id.* at 65:18-20). In fact, he knew only that Empire, as the fiscal intermediary, was responsible for making Medicare payments to St. Vincent's. JA1196, 1198 (*id.* at 67:1-4, 71:3-5). He also has no knowledge of Empire's contract with the government or its requirements. His whole case against Empire is premised on his belief, his speculation, that

65

Empire must not have performed its obligations to the federal government as he believes was required by Empire's contract. JA1195-96 (Landgraber Dep. 64:19-65:1; 65:12-17). However, and perhaps most importantly, Relator has admitted in his deposition testimony that he has no idea what Empire did in response to St. Vincent's submittals, whether Empire reported that information to CMS, whether Empire was directed to make payments to St. Vincent's for the outlier claims, what directives Empire received from CMS, or when, etc. *Id.*

### 3. The District Court's ruling is inconsistent with the Supreme Court's ruling in *Rockwell.*

The Supreme Court's ruling in *Rockwell* supports the foregoing interpretation of Section 3730(e)(4). In *Rockwell*, the relator had been an employee through 1986, for the defendant Rockwell International Corp., and he authored a report indicating that some proposed "pondcrete," made up of a mixture of toxic waste and concrete, "would not work" and the mixture would later "deteriorate and cause unwanted release of toxic wastes." 549 U.S. at 461. A jury ultimately concluded that the "pondcrete" blocks used did deteriorate, but not for the reasons identified in the relator's report. *Id.* at 466-67.

To be compensated by the government, the relator alleged that Rockwell "was required to comply with certain federal and state environmental laws and regulations." *Id.* at 463. A jury found Rockwell liable for a FCA violation for the

66

"1 1/2 year period between April 1, 1987 and September 30, 1988." *Id.* at 475.

The Court held that the relator could not be an "original source" for the following reasons:

> Because Stone[, the relator,] was no longer employed by Rockwell at the time, he did not know that the pondcrete was insolid; he did not know that pondcrete storage was even subject to [the federal environmental statute] RCRA; he did not know that Rockwell would fail to remedy the defect; he did not know that the insolid pondcrete leaked while being stored onsite; and, of course, he did not know that Rockwell made false statements to the Government regarding pondcrete storage.

*Id.*[34]

The same can be said of Relator's claims against Empire here. Relator did not work for or with Empire during the relevant time. JA465 (Landgraber Dep. 59:23-60:8). Relator does not have direct knowledge of any statements made by Empire to CMS, what Empire's obligations to the government were, or even whether Empire drew CMS's attention to the issues relating to St. Vincent's.

The holding in *Rockwell* applies in this analogous situation. *Rockwell* involved speculation about a theory that was not credited and a lack of direct knowledge as to the defendant's conduct for one period of time at issue. Here, Relator lacks direct knowledge as to what Empire did at all, and other pure

---

[34] *See also id.* at 476 ("Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim."); *id.* at 475 (The relator "did not know that the pondcrete failed; he predicted it.").

67

speculation that Empire failed to comply with the governing rules and regulations. That is not original source knowledge of fraud. It is simply rank and erroneous speculation based on information literally available to anyone. Permitting jurisdiction over such a suit would be inconsistent with the purpose of the public disclosure bar, which was designed to limit the class of persons who can pursue FCA claims. *See Schindler*, 131 S. Ct. at 1894 (referencing relator's lawsuit as "a classic example" of "opportunistic" litigation, which the public disclosure bar seeks to discourage).

## CONCLUSION

For all of these reasons and based on the evidence in the record, the District Court lacked jurisdiction over Relator's FCA claims against Empire or, in the alternative, the District Court's grant of summary judgment to Empire should be affirmed.

Dated this 28th day of October, 2013.

/s/ Michael D. Leffel
Michael D. Leffel

MICHAEL D. LEFFEL
FOLEY & LARDNER LLP
150 East Gilman Street
MADISON, WISCONSIN 53703
608.257.5035

68

MICHAEL J. TUTEUR
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, Massachusetts 02199
617.342.4000

*Attorneys for Appellee Empire HealthChoice Assurance, Inc., d/b/a Empire Medicare Services*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief is printed in 14-Point Times New Roman proportional font and contains 16,338 words, excluding parts of the brief excluded by Rule 32(a)(7)(B)(iii).

Dated:      October 28, 2013

/s/ Michael D. Leffel
Michael D. Leffel